Homer L. Blackwell v. Commissioner. Homer L. Blackwell and Leone P. Blackwell v. Commissioner.
Blackwell v. Commissioner
Docket Nos. 78513, 78514.
United States Tax Court
T.C. Memo 1961-124; 1961 Tax Ct. Memo LEXIS 225; 20 T.C.M. (CCH) 599; T.C.M. (RIA) 61124; May 4, 1961
Russell W. Baker, Esq., and Marvin C. Hayward, Esq., for the petitioners. Sylvan Siegler, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax and additions to the tax for the calendar years and in the amounts as follows: Additions to Tax Under I.R.C. 1939
Sec. 294
Sec. 294
Year
Income Tax
Sec. 293(b)
(d)(1)(A)
(d)(2)
1943
$ 3,061.59
$ 1,530.80
1944
884.91
442.46
1945
2,276.48
1,437.75
$289.29
$ 192.86
1946
26,307.02
13,153.51
1,601.21
1947
None
1948
8,600.67
4,300.34
782.89
521.93
1949
1,138.68
569.34
99.85
62.38
1950
3,287.20
1,643.60
295.85
197.23
1951
5,045.50
2,522.75
560.19
373.45
*226 The year 1947 is involved in this case solely by reason of a net operating loss carry-back to the year 1945. The petitioner claims an overpayment for the year 1946. The issues remaining for decision are: Whether the taxable income of petitioner Homer L. Blackwell for the year 1943 was understated. Whether petitioners' net income for the taxable years 1944 to 1951, inclusive, was correctly redetermined by the net worth and exenditures method. Whether petitioners are liable for additions to the tax for fraud. Whether for certain years the returns filed by the petitioners were false or fraudulent with intent to evade tax. Whether, by reason of petitioner Homer L. Blackwell's prior conviction on charges of willful attempted income tax evasion for each of the taxable years 1948 to 1951, inclusive, petitioners are estopped to deny liability for additions to the tax for fraud. Whether petitioners are liable for additions to the tax for failure to file timely declarations of estimated tax. The years 1943 through 1948 involve Homer L. Blackwell. The years 1949, 1950 and 1951 involve both petitioners. Leone P. Blackwell is involved solely because she signed the returns filed *227 for those years. Homer L. Blackwell will generally hereinafter be referred to as the petitioner. Returns for the calendar years involved were filed with the collector of internal revenue at Kansas City, Missouri. Findings of Fact The stipulated facts are found as stipulated. The petitioners are husband and wife and are residents of Kansas City, Missouri. Homer L. Blackwell was born in 1900 in Kansas City, attended grade and high schools there and attended the University of Missouri in the fall of 1919. In 1921 the petitioners were married. They have one son. The petitioner had various jobs while in school such as delivering newspapers, clerking in a drugstore, and operating a jitney service and a trucking business. He also worked as a salesman, selling stock in an advertising company, display advertising, used automobiles and oil. In the 1920's the petitioner and an associate published directories and other advertising matter, and the petitioner operated a motion picture theatre. In about 1925 or 1926 the petitioner operated a "poster exchange" doing business as Independent Poster Exchange. This consisted of purchasing used advertising material from first run motion picture *228 theatres and making it available to subsequent run theatres. The petitioner operated this business until 1940. The petitioner rented a safety deposit box at the City National Bank, Kansas City, Missouri, from 1928 through 1951. He deposited certain cash in this box and from time to time made additions to or withdrawals of cash from this box. The box was approximately 21 1/2 inches long, 5 inches wide and 1 3/4 inches deep. The bank records show the following entries in the petitioner's safety deposit box during the years 1928 to 1951, inclusive: Number of
Year
Entries
1928
21
1929
11
1930
15
1931
17
1932
11
1933
17
1934
40
1937
27
1938
42
1939
32
1940
35
1941
18
1942
5
1943
6
1944
4
1945
19
1946
32
1949
14
1950
28
1951
19 For 1935, 1936, 1947 and 1948 the record is not available. During the years 1930 to 1933, inclusive, petitioner borrowed money at interest from City National Bank, Kansas City, Missouri. The balance due varied from $100 to $550. Thirty loans were made in this period for $100 or more. The last was paid in January 1934. Petitioner's initial loan in 1930 was secured by Liberty Loan bonds in the amount *229 of the loan. Petitioner withdrew bonds from the bank whenever his loan balance was reduced, and furnished the bank with additional bonds as collateral whenever his loan balance was increased. The amount of bonds left with the bank as collateral was at all times equal to the balance in his loan account. In 1935 the petitioners acquired their residence subject to a deed of trust securing a note in the amount of $5,750. Between October 9, 1935 and April 29, 1936, petitioners made payments of principal and interest on this note. When petitioners were unable to obtain a reduction in the rate of interest, they borrowed $4,000 from Bankers Life Company, and paid the balance remaining due on the note. On April 29, 1936, petitioners executed a new note to Bankers Life Company. This note was in the principal amount of $4,000, was to bear interest at 4 1/2 per cent, payable quarterly, and called for quarterly payments of $50 to be made on the principal commencing at the end of each three-months period beginning August 1, 1936, with the remainder of $2,050 becoming due May 1, 1946. The note was secured by a deed of trust on petitioners' residence. During the year 1936 petitioners made interest *230 payments in the total amount of $135 to Bankers Life. On March 26, 1938, Bankers Life, in consideration of the receipt of $4,000 from petitioners, executed a quitclaim deed releasing petitioner's residence from the deed of trust. During 1936 petitioner paid interest in the amount of $45 to Home Federal Savings and Loan Company, Kansas City, Missouri. As of the end of each of the years 1936 to 1939, inclusive, petitioner's accountant prepared profit and loss statements and balance sheets for the Independent Poster Exchange. The following schedule shows the assets and liabilities of the Exchange as of the end of each of the years 1936 to 1939, inclusive, as computed by petitioner's accountant: Assets
12-31-36
12-31-37
12-31-38
12-31-39
Cash in bank
$ 57.25
$ 184.94
$ 4.18
($ 354.00)
Cash on hand
50.00
50.00
50.00
50.00
Furniture & Fixtures
1,049.90
1,200.00
1,200.00
1,200.00
Depreciation
10.04
10.04
10.04
Overdraft
11.20
Total assets
$1,157.15
$1,456.18
$1,264.22
$ 906.04
Liabilities
Employer's social security
$ 7.15
$ 7.80
$ 5.60
tax for December
Employee's social security
7.15
7.80
5.60
tax for December
Reserve for depreciation on
10.04
10.04
10.04
Furniniture & Fixtures
Liabilities and net worth
1,431.84
1,238.58
884.80
Accrued salary Blackwell
$1,771.94
Overdraft
(8.08)
Net worth
1,000.00
Loss
(1,606.71)
Total liabilities and net
$1,157.15
$1,456.18
$1,264.22
$ 906.04
worth
*231 The records of the district director of internal revenue, Kansas City, Missouri, do not disclose the filing of an income tax return by petitioner for any taxable year prior to the taxable year 1936. Petitioner's income tax returns for the taxable years 1936 to 1942, inclusive, disclose net income and income tax in the following amounts: Taxable
Net In-
Income
Year
come
Tax
1936
$ 85.78
None
1937
1,685.15
None
1938
1,553.54
None
1939
1,706.49
None
1940
6,894.17
$ 189.16
1941
7,477.96
698.34
1942
7,331.10
1,239.10
Petitioner's income tax returns for the taxable years 1936 to 1939, inclusive, disclose the following with respect to the operation of the Independent Poster Exchange: 1936
1937
1938
1939
Total receipts from business
$27,646.06
$31,805.16
$27,258.03
$28,478.89
Material and supplies
9,927.41
7,800.47
Merchandise bought for sale
7,914.47
13,342.46
Other costs
3,351.82
Net cost of goods sold
7,914.47
13,279.23
7,800.47
13,342.46
Other business deductions
19,607.56
17,440.78
17,749.21
13,204.62
Net profit
124.03
1,085.15
1,708.35
1,931.81
No inventory was shown.
*232 Between October 1940 and September 1941 petitioners purchased United States savings bonds having a face value in the total amount of $1,775. All of these bonds were redeemed by petitioners during the month of December 1941. On his Federal income tax return for 1942 petitioner reported a short-term capital gain in the amount of $107.25 resulting from the sale for $647.25 of certain Denver & Rio Grande Western Railroad Company bonds purchased at a cost of $540. On April 6, 1943, petitioner sold certain corporate stocks and bonds which he had purchased during the year 1942. The following schedule shows these stocks and bonds, dates of purchase, cost, sales price and gain: Date of
Description of Item
Purchase
Cost
Sales Price
Gain
St. Louis & San Francisco Bonds
10- 8-42
$ 671.25
$ 939.75
$268.50
Mo. Pacific Railway Company Stock
10- 7-42
77.00
165.44
88.44
Pan American Airways Stock
10- 7-42
211.31
313.28
101.97
Remington Rand Company Stock
10- 7-42
101.30
142.56
41.26
Baltimore & Ohio Railway Company
Bonds
9-15-42
742.85
1,093.47
350.62
Totals
$1,803.71
$2,654.50
$850.79
The taxable gain was $675.48.
On his Federal *233 income tax return for 1943 petitioner failed to report any portion of the taxable gain derived from the sale of such stocks and bonds. During 1944 petitioner sold certain railroad bonds for a gain of approximately $500. On his return for 1944 petitioner failed to report any portion of this gain. On March 9, 1940, petitioner sold the business known as the Independent Poster Exchange to a corporation operating under the name of Advertising Accessories, Inc. pursuant to the terms of a written agreement. This agreement provided, in part, as follows: WHEREAS, Blackwell is operating, in his own name, an advertising accessory business, * * * under the name of Independent Poster Exchange, and serving exhibitors with, and selling, distributing and renting various kinds of, advertising accessories * * * WHEREAS, Blackwell is willing to sell such business, and all the assets and good will therein involved to Accessories in consideration solely of Accessories executing a contract of employment to Blackwell for a term of five years, at an annual salary of Eight Thousand ($8,000) Dollars a year, payable in weekly installments; NOW, THEREFORE, in consideration of One ($1.00) Dollar interchanged *234 between the parties, receipt of which is hereby acknowledged, it is mutually agreed as follows: 1. Blackwell hereby agrees to sell, as of February 1, 1940, the good will, all contracts with exhibitors, all stock on hand or sold to and in the hands of exhibitors under repurchase arrangements, all furniture, fixtures and other assets of whatsoever kind and nature, of and however used in conjunction with the operation of such business, and whether situated in such premises or elsewhere * * * to Accessories, for a total purchase price, to consist solely of the execution by Accessories of a contract of employment of even date herewith, wherein Accessories engages Blackwell as its employee at an annual salary of Eight Thousand ($8,000) Dollars, payable in equal weekly installments, with the possible reduction thereof to Four Thousand ($4,000) Dollars per year as hereinafter specified. * * *
In the event that Blackwell should die, or if either Accessories or Blackwell should terminate the employment of Blackwell for any reason, as provided in such contract of employment, before the expiration of such contract of employment, Accessories will pay for the remaining part of the five *235 year term of Blackwell's contract of employment the sum of Four Thousand ($4,000) Dollars per year, or pro-rated for any part of a year, for such unexpired term, provided and so long as Blackwell conforms to the provisions of Paragraph "11" hereof; and payment shall be made to Blackwell, if termination occurs while Blackwell lives; but upon his death, payment shall be made to Blackwell's widow if living, and if not, to his children, if living, and if not, to his estate. It is the agreement of the parties that although the death of Blackwell would otherwise terminate all obligations of Accessories under this contract of employment, nevertheless, Accessories agrees to pay Blackwell's widow, or the other parties above specified, the amounts specified for the term of such contract, as consideration to Blackwell for the sale of his business as herein provided. The foregoing payment of Four Thousand ($4,000) Dollars per year for the unexpired term (or pro-rated for any part of the year) as provided for in this agreement and in the contract of employment shall constitute the only payment to be made under both contracts to Blackwell upon the happening of the events and conditions specified *236 in both contracts. Also on March 9, 1940, petitioner entered into a contract of employment with Advertising Accessories, Inc. This contract provided, in part: FIRST: Accessories hereby engages Blackwell as its employee for a term of five (5) years from the date hereof at a yearly salary of Eight Thousand ($8,000.00) Dollars payable weekly in the sum of $153.84, except as hereinafter provided. The duties of Blackwell shall be those of a general representative, as shall be specified from time to time by Accessories. The main place of employment of Blackwell shall be in Kansas City, Missouri. Blackwell, however, will be required, whenever determined by Accessories, to travel on the business of Accessories. SECOND: Blackwell hereby accepts such employment, and agrees faithfully to perform all of such duties, and to devote his working time exclusively to the business of Accessories except for four (4) months when he may as an incidental activity liquidate and dispose of his existing state right films. Blackwell agrees that he will not for the term hereof, engage in (directly or indirectly, in the name of, or through, or by having any interest in any corporation, partnership, or person *237 or otherwise) the business of selling, leasing, or licensing of advertising accessories, or in the entertainment business, or any branch or part of the entertainment business, except that Blackwell may buy and/or sell stocks or other securities listed upon any recognized stock exchange, and except that Blackwell may retain any interests he now has as scheduled at the end of this contract. * * *
FIFTH: This contract is being executed simultaneously with the contract between the parties hereto providing for the sale of the business of Blackwell to Accessories. This contract can be cancelled if there shall be any material breach on the part of Blackwell under the contract of even date herewith, particularly in reference to the warranties and representations therein contained. This contract of employment is consideration moving to Blackwell for the sale and delivery of his business and property to Accessories covered in the said contract executed simultaneously herewith. During the taxable year 1942 the weekly salary paid petitioner pursuant to the terms of the agreements dated March 9, 1940 was increased by $25. Petitioner continued in the employ of Advertising Accessories, *238 Inc. or its successor corporation, National Screen Service Corporation, from March 9, 1940 until February 5, 1943. On his tax returns for the taxable years 1940 to 1943, inclusive, petitioner reported the following amounts of salary from this employer: Year
Salary
1940
$7,292.02
1941
8,000.00
1942
9,100.00
1943
690.36
On February 5, 1943, petitioner entered into an agreement with National Screen Service Corporation, which agreement provided, in part: WHEREAS, NATIONAL is the successor of Advertising Accessories, Inc. and has assumed the obligations of Advertising Accessories, Inc., (hereinafter called "ACCESSORIES"), and WHEREAS, ACCESSORIES and BLACKWELL entered into an agreement dated January 1940, which became effective on February 1, 1940, by the terms of which BLACKWELL sold to ACCESSORIES the good will, all contracts with exhibitors, all stock on hand or sold to and in the hands of exhibitors under repurchase arrangements, all furniture, fixtures and other assets of whatsoever kind and nature, of and however used in conjunction with the operation of the advertising accessory business, located at 110 West 18th Street, Kansas City, Missouri, under *239 the name of Independent Poster Exchange, in consideration of ACCESSORIES executing a contract of employment to BLACKWELL for a term of five (5) years at an annual salary of Eight Thousand ($8,000) Dollars payable in weekly instalments, and WHEREAS, simultaneously and in accordance with the execution of the above agreement, ACCESSORIES engaged BLACKWELL as its general representative pursuant to a separate written agreement also dated January 1940 for a term of five (5) years commencing February 1, 1940 and ending January 31, 1945 at an annual salary of Eight Thousand ($8,000) Dollars payable in weekly instalments, and WHEREAS, NATIONAL and BLACKWELL have agreed to terminate such employment effective as of the 1st day of February, 1943, and WHEREAS, NATIONAL and BLACKWELL desire to fully settle and satisfy all claims, charges and accounts which either has against the other, and for such purpose NATIONAL also includes ACCESSORIES, NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, it is mutually agreed as follows: FIRST: That BLACKWELL's employment by NATIONAL SCREEN be and the same hereby is discontinued and terminated as of February 1, 1943. *240 SECOND: NATIONAL agrees to pay and BLACKWELL agrees to accept the sum of Twelve Thousand ($12,000) Dollars, receipt of which is hereby acknowledged by BLACKWELL, in full payment and settlement of all sums that may be due him under and pursuant to the above mentioned contracts. Pursuant to the above agreement, petitioner received from National prior to the end of the taxable year 1943 payments in the total amount of $12,000. Petitioner omitted the $12,000 payment from the information sheets furnished his accountant for the preparation of his 1943 return, and no portion of the $12,000 was ever reported by petitioner for Federal income tax purposes. From October 4, 1943 until approximately October 12, 1944, petitioner and Ross Calkins, as partners, operated a wholesale furniture business known as the Calkins-Black-well Furniture Company. As of December 31, 1943 and as of December 31, 1944, petitioner's net investment in the Calkins-Blackwell Furniture Company partnership amounted to $7,896.85 and $1,131.08, respectively. On and after October 12, 1944, petitioner operated a wholesale furniture business as sole proprietor. Initially this was carried on at the premises previously *241 occupied by the Calkins-Blackwell partnership. It was carried on under the name of "Associated Furniture Distributors" until 1948 and thereafter under the name of "Blackwell's Wholesale Furniture Company." This will be referred to herein under the latter name or as the petitioner's furniture business. As of December 31 of each of the years 1944 to 1947, inclusive, the balance in the checking account carried in the name of the petitioner's furniture business at the First National Bank, Kansas City, Missouri, as shown by the records of the bank, were as follows: December 31,
Balance
1944
$ 3,941.43
1945
9,409.74
1946
13,373.45
1947
9,631.59
As of December 31 of each of the years 1948 to 1951, inclusive, the reconciled balances in the checking account carried in the name of the business at the First National Bank, according to petitioner's canceled checks and other bank records, were as follows: December 31,
Reconciled Balance
1948
($1,337.80)
1949
(1,059.07)
1950
(7,076.52)
1951
(1,711.67)
As of December 31, 1944 and as of December 31 of each of the taxable years 1945 to 1951, inclusive, the petitioner's furniture business had accounts *242 receivable, merchandise inventory, and fixed assets, as follows: Decem-
Accounts
Cost of
Cost of
ber 31,
Receivable
Inventory
Fixed Assets
1944
$ 2,304.36
$ 2,636.81
$ 324.00
1945
3,040.35
4,601.57
659.50
1946
7,411.39
40,226.50
1,291.00
1947
11,324.25
24,025.31
1,534.29
1948
22,449.95
40,986.79
1,809.63
1949
19,825.11
32,939.61
1,809.63
1950
22,298.47
72,495.13
3,020.93
1951
18,281.12
65,384.07
4,697.93
As of December 31, 1950 and as of December 31, 1951, the business owned improvements to leased property having a cost in the amounts of $1,126.32 and $1,860.85, respectively. As of December 31 of each of the taxable years 1948 to 1951, inclusive, petitioners, according to the records of the First National Bank, were liable to the bank on notes payable in the following amounts: December 31,
Notes Payable
1948
$10,000.00
1949
5,000.00
1950
23,000.00
1951
15,000.00
As of December 31 of each of the taxable years 1947 to 1951, inclusive, petitioner was liable on accounts payable in the following amounts: December 31,
Accounts Payable
1947
$ 2,814.70
1948
3,354.40
1949
1,871.42
1950
10,458.01
1951
5,376.59
*243 During the taxable year 1944 petitioner made payments on 1943 income taxes in the total amount of $54.20. During the taxable years 1946 and 1947 petitioner, at the time of filing his individual income tax return, made payments of income taxes in the amounts of $338.83 and $379.86, respectively. During the taxable year 1949 petitioners, at the time of filing their joint income tax return, made a payment of income tax in the amount of $98.20. During the taxable years 1944 to 1947, inclusive, petitioner made the following payments on declarations of estimated tax: Taxable Year
Amount of Payment
1944
$ 46.09
1945
15.00
1946
320.00
1947
700.00
During the taxable year 1949 petitioners made payments in the total amount of $99 on their declaration of estimated tax. As of December 31 of each of the taxable years 1944 to 1951, inclusive, the amounts allowable as reserves for depreciation on fixed assets owned by the business were as follows: December 31,
Reserve for Depreciation
1944
$ 32.40
1945
98.35
1946
195.87
1947
337.13
1948
504.32
1949
685.28
1950
926.80
1951
1,312.74
As of December 31, 1950 and December 31, 1951, the *244 amounts allowable as reserves for amortization on leasehold improvements were $112.63 and $372.16, respectively. During the taxable year 1949 petitioner Leone P. Blackwell received an inheritance from the estate of her uncle, Otto R. Kettler, Pittsburg, Kansas, in the net amount of $794.94. During the taxable year 1951 the petitioners purchased a membership in a country club at a cost of $1,200. In 1943 and 1944 the petitioners had a checking account in the City National Bank. The balance in this account was $1,120.86 on December 31, 1943 and was $601.21 on December 31, 1944. The account was closed in 1945. During all or part of the period involved herein petitioners maintained at the First National Bank a joint checking account, a checking account in the name of Leone P. Blackwell or Gladys Irene Blackwell (sister of Homer); and a savings account in the name of both petitioners. The year-end balance in these accounts (as shown by the records of the bank) were as follows: Checking Accounts
Savings Account
First
Leone P. or Gladys
First
December 31,
National Bank
Irene Blackwell
National Bank
1943
$ 273.19
1944
887.04
$130.00
1945
944.21
257.48
1946
2,567.78
$ 322.48
411.04
1947
1,597.28
1,795.70
802.50
1948
379.40
1,795.70
903.25
1949
2,653.27
920.70
908.25
1950
1,065.65
1,503.20
913.25
1951
2,876.11
1,469.60
922.37
*245 As of December 31 of each of the taxable years 1943 to 1951, inclusive, petitioners owned a residence located at 7430 Holmes Street, Kansas City, Missouri, which had a cost to them in the amount of $7,500. During 1948 petitioners made improvements to this residence at a cost of $5,500. As of the end of each of the taxable years involved herein the furniture located in petitioners' residence had a cost of $6,000. As of December 31 of each of the taxable years 1943 to 1951, inclusive, petitioners owned United States Government bonds having a cost in the following amounts: December 31,
Cost of Bonds
1943
$ 4,050.00
1944
4,050.00
1945
4,050.00
1946
4,050.00
1947
10,875.00
1948
12,825.00
1949
15,412.50
1950
13,612.50
1951
9,262.50
The following schedule shows the total cost of the United States Government bonds purchased and redeemed by petitioners during the taxable years (none prior to 1947): Cost of Bonds
Cost of
Years
Purchased
Bonds Redeemed
1947
$6,825.00
None
1948
1,950.00
None
1949
2,587.50
None
1950
2,250.00
$4,050.00
1951
1,500.00
5,850.00
As of December 31 of each of the taxable years 1943 to 1951, *246 inclusive, petitioners owned corporate stocks having a cost in the following amounts: December 31,
Cost of Stocks
1943
$ 1,829.96
1944
1,929.32
1945
1,929.32
1946
1,929.32
1947
2,714.32
1948
2,714.32
1949
3,689.32
1950
8,211.82
1951
14,621.82
As of December 31, 1943 and December 31, 1944, petitioner's net investment in the Calkins-Blackwell Furniture Company amounted to $7,896.85 and $1,131.08, respectively. On October 19, 1948, petitioner, and certain other persons formed a corporation known as Home Furnishings, Inc. of Abilene, Kansas. The corporation continued in existence until December 31, 1951. As of December 31, 1948, 1949 and 1950 petitioner's net investments in this corporation amounted to $6,500, $6,500 and $193.30, respectively. As of December 31, 1948 and December 31, 1949, this corporation was indebted to petitioner in the amount of $2,600. As of December 31 of each of the taxable years 1943 to 1951, inclusive, petitioners owned automobiles having a cost in the following amounts: December 31,
Cost of Automobiles
1943
$2,500.00
1944
2,500.00
1945
2,500.00
1946
4,166.71
1947
4,739.81
1948
5,281.80
1949
5,281.80
1950
8,997.10
1951
6,702.74
*247 The petitioner used a double-entry bookkeeping system in his furniture business until July 1945 and a single-entry system thereafter. Charge sales were generally recorded. There were some sales in which the petitioner retained the proceeds before the sales were posted. The petitioner's bookkeeper entered some sales in a looseleaf notebook as "Cash sales made & Kept by HLB." The entries in this record showed only monthly amounts and an annual total. The original invoices from which these figures were compiled were destroyed. The following tabulation summarizes petitioner's records respecting the proceeds of cash sales kept by him during the years 1945 to 1951, inclusive: Proceeds of Cash Sales
Year
Kept by Petitioner
1945
$ 5,412.16
1946
13,201.29
1947
13,762.12
1948
27,754.59
1949
22,983.60
1950
40,812.93
1951
43,346.64
The petitioner's bookkeeper kept a record purporting to show the capital contributions to and withdrawals from the business. It was a practice of petitioner to take business checks to the bank, have the checks cashed, and deposit all or a portion of the proceeds to the business bank account, such deposits being identified on the *248 deposit slips as deposits of currency. In the following instances business checks were cashed at the bank and some or all of the proceeds of such checks were deposited to the business bank account as currency deposits: Amount of
Amount
Currency
Date
of Checks
Deposit
July 5, 1946
List of Checks
$3,300.00
February 23, 1950
$ 706.09
700.00
October 21, 1950
507.39
500.00
October 27, 1950
963.51
950.00
December 18, 1950
$1,023.36
$1,055.00
January 23, 1951
338.00
325.00
April 19, 1951
629.64
600.00
June 6, 1951
763.12
700.00
June 13, 1951
476.50
400.00
July 24, 1951
338.34
325.00
December 18, 1951
2,114.85
1,714.85
Each of the above deposits is shown on the record of capital contributions as a "Cash" contribution to the business on the same date as the date of the deposit. With respect to the deposit of $1,055 made on December 18, 1950, the "Capital" sheet shows a "Cash" contribution on that date of $1,000 rather than $1,055. In all other instances the amount of the deposit shown on the deposit slips is identical with the amount of the "Cash" contribution shown on the "Capital" sheets as having been made on the date of deposit. *249 The following tabulation shows the source of certain deposits, all of which appear on the sheet captioned "Capital "as "Cash" contributed to the business on the same date as the date of the deposit: Amount
Date of Deposit
of Deposit
Source of Deposit
October 12, 1944
$1,500.00
Transfer of check from personal account
July 5, 1946
3,300.00
List of checks
August 31, 1946
7,000.00
Transfer of check from personal account
October 22, 1947
1,000.00
Transfer of check from personal account
November 7, 1947
750.00
Transfer of check from personal account
November 21, 1947
1,185.00
$750 currency and $485 check
October 12, 1948
5,000.00
Proceeds of loan from First National Bank
December 7, 1948
5,000.00
Proceeds of loan from First National Bank
February 23, 1950
700.00
List of checks totaling $706.09
March 25, 1950
1,200.00
Check in the amount of $1,084.00 and check
in the amount of $120.00
May 23, 1950
600.00
Transfer of check from personal account
October 26, 1950
2,175.00 *
$2,000 check in name of L. P. Blackwell and
$175.00 cash
October 27, 1950
950.00
List of checks totaling $963.51
December 18, 1950
1,000.00
Checks totaling $1,023.36
January 23, 1951
325.00
Checks totaling $338.00
April 19, 1951
600.00
Check in the amount of $629.64
June 6, 1951
700.00
Check or checks totaling $763.12
June 13, 1951
400.00
Check or checks totaling $476.50
July 24, 1951
325.00
Check or checks totaling $338.34
December 18, 1951
1,714.85
Check or checks totaling $2,145.00
*250 Petitioner's income tax returns for the taxable years 1944 to 1951, inclusive, show the following with respect to the operation of the wholesale furniture business: Taxable
Total
Cost of
Gross
Year
Receipts
Purchases
Goods Sold
Profit
Net Profit
1944
$ 13,933.77
$ 13,275.95
$ 10,639.14
$ 3,294.63
$ 1,791.06 *
1945
108,833.46
95,683.48
97,140.94
11,692.52
3,526.23 **
1946
380,411.79
384,846.66
349,221.73
31,190.06
6,106.51
1947
160,545.17
123,024.42
139,225.61
21,319.56
(1,210.33)
1948
208,241.82
199,144.79
182,183.31
26,058.51
3,075.39
1949
184,656.18
148,928.22
166,874.49
17,781.69
(9,792.23)
1950
264,715.89
242,553.49
219,092.49
45,623.40
1,933.01
1951
318,853.98
246,723.05
267,608.77
51,245.21
8,369.28
The amount of net income and income tax shown on petitioner's income tax returns *251 for the taxable years 1943 to 1951, inclusive, are shown in the following schedule: Taxable Year
Net Income
Income Tax
1943
$ 1,450.45 [1]
$ 4.76 [2]
1944
150.29
None
1945
3,526.23 [3]
399.92 [4]
1946
6,106.51
699.86
1947
(1,210.33)
None
1948
3,075.39
98.20
1949
(9,780.01)
None
1950
1,015.32
None
1951
7,926.52
1,259.72
During each of the years 1942, 1944, 1945, 1946, 1948, 1949, 1950 and 1951 petitioner borrowed money at interest and without the furnishing of collateral from the First National Bank. The following schedule shows the total amount of the loans made to petitioner during these years and the rate of interest charged by the bank with respect to such loans: Total Amount
Year
of Loans
Rate of Interest
1942
$ 1,900.00
6%
1944
1,000.00
6%
1945
7,500.00
6% (4% on or after
July 23, 1945)
1946
$ 35,000.00
4%
1948
10,000.00
4%
1949
11,000.00
4%
1950
28,000.00
4%
1951
7,000.00
4%
Total
$101,400.00
*252 During the period involved herein petitioner issued a number of financial statements to the First National Bank. On each of these statements there appeared the following language: "For the purpose of obtaining loans and discounting paper with you, and otherwise procuring credit from time to time, I furnish you with the following statement and information which is shown by my books to be a true and correct statement of my financial condition on" the date of the statement. Each of the statements was signed by petitioner, and on the statement dated May 15, 1945 the following language was typed above his signature: "Above figures are approximate only but are definitely within 10% of absolute." The following schedule shows data appearing on the financial statements submitted by petitioner to the First National Bank: Cash
Date of
Total
Statement
Bank
Cash
Total Assets
Liabilities
Net Worth
May 15, 1945
$18,000.00
$ 46,000.00
$ 7,100.00
$ 38,900.00
July 3, 1946
$16,754.58
15,937.43
103,125.42
27,116.21
76,009.21
Nov. 1, 1948
6,830.39
14,700.00
110,893.68
13,672.43
97,221.25
Aug. 11, 1950
5,764.43
22,000.00
136,154.79
9,762.21
126,392.58
Jan. 13, 1951
1,317.26
151,682.74
33,621.32
118,061.42
*253 During the years 1943 to 1945, inclusive, petitioner owned a 1939 Cadillac automobile having a cost of $1,250; and during the years 1946 to 1951, inclusive, petitioner owned a 1946 Cadillac automobile having a cost of $2,987.44. Each of these had a useful life of 6 years and was devoted 50 per cent to business use. They had salvage values of $250 and $500, respectively. The following tabulation shows the annual amount allowable for depreciation and the amount of the allowable reserve for depreciation on automobiles during each of the years involved herein: Annual Allowance
Reserve for
Year
for Depreciation
Depreciation
1943
$ 83.33 1/4th
$ 20.83
1944
83.33
104.16
1945
83.33
187.49
1946
207.28
207.28
1947
207.28
414.56
1948
207.28
621.84
1949
207.28
829.12
1950
207.28
1,036.40
1951
207.28
1,243.68
The petitioner's books recorded cash sales in amounts less than actual cash sales by at least $9,000 in 1949 and by at least $4,000 in 1950. A statement of profit and loss for 1949 written in pencil showed cash sales of $32,119.56. The statement showed total sales, gross profit and net loss computed on the basis of cash sales of this *254 amount. A typed statement of profit and loss and the record of "Cash sales kept by HLB" showed cash sales of $22,983.60, arrived at by subtracting cash refunds of $135.96 from $32,119.56 and reducing the total by $9,000. Total sales, gross profit and net loss were computed on the basis of cash sales of the reduced amount. A similar reduction of $4,000 in the record of cash sales was made with respect to the profit and loss statement for 1950. The reduced figures on the typed statements were furnished to the petitioners' accountants for preparing the tax returns and were so used. The penciled statements showing the larger amounts were kept in the safe deposit box and found there by respondent's agents in 1951. During the years 1944 to 1951, inclusive, petitioners' personal living expenses were not less than the following amounts: Amount of Personal
Year
Living Expenses
1944
$4,000
1945
5,000
1946
5,000
1947
6,500
1948
6,500
1949
7,000
1950
8,000
1951
9,000
On October 30, 1951, the petitioner's safety deposit box contained twelve $100 bills, United States Series E Bonds in the names of one or both of the petitioners in the face amount of $12,750, *255 four envelopes containing cash in the amounts of $79, $28, $20.12 and $13, several insurance policies, several stock certificates, various items of correspondence, some jewelry, a paid note, a contract on the petitioners' residence, and penciled profit and loss statements for the years 1949 and 1950. The following schedule shows the declarations of estimated tax filed by petitioners for the taxable years 1945, 1946, 1948, 1949, 1950 and 1951, the dates of filing, and the amounts of estimated tax shown thereon: Declaration
for Tax-
Amount of
able Year
Date of Filing
Estimated Tax
1945
April 14, 1945
$ 61.09
1946
March 15, 1946
320.00
1948
Not shown
None
1949
April 15, 1949
99.00
1950
April 15, 1950
99.00
1951
March 15, 1951
None
The petitioner's accountant's office record indicates that a declaration of estimated tax for 1948 prepared for Blackwell was delivered March 12, 1948 and filed March 15, 1948. On March 10, 1955, Homer L. Blackwell was indicted on four counts for willfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him for the taxable years 1948 to 1951, inclusive. In a trial *256 in the District Court of the United States for the Western District of Missouri in November 1955, petitioner was found guilty on all four counts. In March 1956 petitioner was sentenced for a period of one year and was assessed a fine in the amount of $500 on each count. The judgment of the District Court was appealed to the Court of Appeals for the Eighth Circuit, and was affirmed in May 1957. The decision of the District Court became final upon the denial of a petition for certiorari by the Supreme Court of the United States in October 1957. On their return for 1950 petitioners reported a long-term capital loss resulting from the operation of Home Furnishings, Inc., in the total amount of $6,315.60. Of this amount, $1,000 was deducted in 1950, one-half, or $3,157.80 constituted a nondeductible capital loss, and the remainder, or $2,157.80, constituted a capital loss carry-over to 1951. In computing petitioners' adjusted gross income for the years 1950 and 1951, respondent added to the total of the increase in net worth plus nondeductible expenditures for the year 1950 the capital loss carry-over in the amount of $2,157.80 and the nondeductible capital loss of $3,157.80; and subtracted *257 from the total of the increase in net worth plus nondeductible expenditures for the year 1951 a capital loss carry-over in the maximum allowable amount of $1,000. Respondent determined that petitioner sustained a net operating loss in the amount of $2,293 for the taxable year 1947, and that this amount should be carried back to the taxable year 1945. The following schedules show the petitioners' net income, as determined by the respondent under the net worth and expenditures method, for each of the taxable years 1944 to 1951, inclusive: COMPUTATION OF NET INCOME BY NET WORTH AND EXPENDITURES METHOD December 31 ASSETS
1943
1944
1945
Cash on Hand
$ 0
$ 0
$ 0
Personal Bank Accounts
1,394.05
1,618.25
1,201.69
Residence - 7430 Holmes, Kansas City, Mo.
7,500.00
7,500.00
7,500.00
Furniture in Residence
6,000.00
6,000.00
6,000.00
U.S. Government Bonds - Cost
4,050.00
4,050.00
4,050.00
Stocks - Cost
1,829.96
1,929.32
1,929.32
Interest in Calkins-Blackwell Partnership
7,896.85
1,131.08
Automobiles
2,500.00
2,500.00
2,500.00
Business Assets - Blackwell's Wholesale
Furniture Co.: Cash in Bank
3,941.43
9,409.74
Accounts Receivable
2,304.36
3,040.35
Merchandise Inventory
2,636.81
4,601.57
Petty Cash
50.00
50.00
Fixed Assets
324.00
659.50
Total Assets
$ 31,170.86
$ 33,985.25
$ 40,942.17
LIABILITIES AND RESERVES
Reserve for Depreciation - Fixed Assets
$ 32.40
$ 98.35
Reserve for Depreciation - Automobiles
$ 20.83
104.16
187.49
Total Liabilities and Reserves
$ 20.83
$ 136.56
$ 285.84
Net Worth
$ 31,150.03
$ 33,848.69
$ 40,656.33
Less: Net Worth at End of Previous Year
31,150.03
33,848.69
Annual Increase in Net Worth
$ 2,698.66
$ 6,807.64
Add: Personal Living Expenses
4,000.00
5,000.00
Federal Income Tax Payments: Payments Made on Prior Year's Tax
54.20
Payments Made on Declaration of Estimated
46.09
15.00
Tax
Adjustment of Excess Medical Exp.
74.54
Deduction
Adjustment of Contributions Deduction
(377.46)
Total Increase in Net Worth Plus
$6,496.03
$ 11,822.64
Non-Deductible Expenditures
Adjusted Gross Income
$ 6,496.03
$ 11,822.64
Allowable Deductions - Per Original
421.21
852.66
Return or Standard Deduction
Corrected Net Income Before Operating
$ 6,074.82
$ 10,969.98
Loss Carry-Back
Operating Loss Carry-Back
(2,293.00)
Corrected Net Income
$ 6,074.82
$ 8,676.98
Reported Net Income
(270.92)
2,673.59
Unreported Net Income
$ 6,345.74
$ 6,003.39
*258 ASSETS
1946
1947
1948
Cash on Hand
$ 0
$ 0
$ 0
Personal Bank Accounts
3,301.30
4,195.48
3,078.35
Residence - 7430 Holmes, Kansas City,
7,500.00
7,500.00
7,500.00
Mo.
Improvements to Residence - 7430 Holmes
5,500.00
Furniture in Residence - 7430 Holmes
6,000.00
6,000.00
6,000.00
U.S. Government Bonds - Cost
4,050.00
10,875.00
12,825.00
Stocks - Cost
1,929.32
2,714.32
2,714.32
Investment in Home Furnishings, Inc.,
6,500.00
Abilene, Kan.
Loan - Home Furnishings, Inc.
2,600.00
Automobiles
4,166.71
4,739.81
5,281.80
Business Assets - Blackwell's Wholesale
Furniture Co.: Cash in Bank
13,373.45
9,631.59
(1,337.80)
Accounts Receivable
7,411.39
11,324.25
22,449.95
Merchandise Inventory
40,226.50
24,025.31
40,986.79
Petty Cash
50.00
50.00
50.00
Fixed Assets
1,291.00
1,534.29
1,809.63
Total Assets
$ 89,299.67
$ 82,590.05
$115,958.04
LIABILITIES AND RESERVES
Notes Payable
$ 10,000.00
Accounts Payable
$ 2,814.70
3,354.40
Reserve for Depreciation - Fixed Assets
$ 195.87
337.13
504.32
Reserve for Depreciation - Automobiles
207.28
414.56
621.84
Total Liabilities and Reserves
$ 403.15
$ 3,566.39
$ 14,480.56
Net Worth
$ 88,896.52
$ 79,023.66
$101,477.48
Less: Net Worth at End of Previous Year
40,656.33
88,896.52
79,023.66
Less: Net Worth at End of Previous Year
40,656.33
88,896.52
79,023.66
Annual Increase in Net Worth
$ 48,240.19
$ (9,872.86)
$ 22,453.82
Add: Personal Living Expenses
$ 5,000.00
$ 6,500.00
$ 6,500.00
Federal Income Tax Payments: Payments Made When Filing Returns
338.83
379.86
Payments Made on Declaration of Est.
320.00
700.00
Tax
Adjustment of Excess Medical Exp.
49.77
Deduction
Refund of Federal Income Taxes
(700.00)
Total Increase in Net Worth Plus
$ 53,948.79
$ (2,293.00)
$ 28,253.82
Non-Deductible Expenditures
Less: Non-Taxable Portion of Long-Term
220.00
Capital Gain
Adjusted Gross Income
$ 53,948.79
$ (2,293.00)
$ 28,033.82
Allowable Deductions - Per Original
1,076.04
1,000.00
Return or Standard Deduction
Corrected Net Income Before Operating
$ 52,872.75
$ (2,293.00)
$ 27,033.82
Loss Carry-Back
Operating Loss Carry-Back
2,293.00
Corrected Net Income
$ 52,872.75
$ 27,033.82
Reported Net Income
5,030.47
$ (1,210.33)
2,391.54
Unreported Net Income
$ 47,842.28
$ 24,642.28
*259 ASSETS
1949
1950
1951
Cash on Hand
$ 0
$ 0
$ 0
Personal Bank Accounts
4,482.22
3,482.10
5,268.08
Residence - 7430 Holmes, Kansas City, Mo.
7,500.00
7,500.00
7,500.00
Improvements to Residence - 7430 Holmes
5,500.00
5,500.00
5,500.00
Furniture in Residence - 7430 Holmes
6,000.00
6,000.00
6,000.00
U.S. Government Bonds - Cost
15,412.50
13,612.50
9,262.50
Stocks - Cost
3,689.32
8,211.82
14,621.82
Investment in Home Furnishings, Inc.,
6,500.00
193.30
Abilene, Kan
Loan - Home Furnishings, Inc.
2,600.00
Automobiles
5,281.80
8,997.10
6,702.74
Membership - Country Club
1,200.00
Business Assets - Blackwell's Wholesale
Furniture Co.: Cash in Bank
(1,059.07)
(7,076.52)
(1,711.67)
Accounts Receivable
19,825.11
22,298.47
18,281.12
Merchandise Inventory
32,939.61
72,495.13
65,384.07
Petty Cash
50.00
50.00
50.00
Fixed Assets
1,809.63
3,020.93
4,697.93
Improvements to Leased Property
1,126.32
1,860.85
Total Assets
$110,531.12
$145,411.15
$144,617.44
LIABILITIES AND RESERVES
Notes Payable
$ 5,000.00
$ 23,000.00
$ 15,000.00
Accounts Payable
1,871.42
10,458.01
5,376.59
Reserve for Depreciation - Fixed Assets
685.28
926.80
1,312.74
Reserve for Amortization - Leasehold
112.63
372.16
Improvements
Reserve for Depreciation - Automobiles
829.12
1,036.40
1,243.68
Total Liabilities and Reserves
$ 8,385.82
$ 35,533.84
$ 23,305.17
Net Worth
$102,145.30
$109,877.31
$121,312.27
Less: Net Worth at End of Previous Year
$101,477.48
$102,145.30
$109,877.31
Annual Increase in Net Worth
$ 667.82
$ 7,732.01
$ 11,434.96
Add: Personal Living Expenses
$ 7,000.00
$ 8,000.00
$ 9,000.00
Federal Income Tax Payments: Payments Made When Filing Returns
98.20
Payments Made on Declaration of Est. Tax
99.00
Refund of Federal Income Taxes
(250.61)
Total Increase in Net Worth Plus
Non-Deductible Ex-
penditures
$ 7,614.41
$ 15,732.01
$ 20,434.96
Less: Non-Taxable Portion of Long-Term
430.51
Capital Gain
Capital Loss Carry-Over - Per Orig.
(2,157.80)
1,000.00
Return
Non-Deductible Capital Loss - Per Orig.
(3,157.80)
Return
Non-Taxable U.S. Government Bond Interest
1,375.00
Inheritance
794.94
Adjusted Gross Income
$ 6,819.47
$ 19,672.61
$ 19,004.45
Allowable Deductions - Per Original
Return or Standard
Deduction
823.40
1,000.00
1,107.21
Corrected Net Income Before Operating
$ 5,996.07
$ 18,672.61
$ 17,897.24
Loss Carry-Back
Operating Loss Carry-Back
Corrected Net Income
$ 5,996.07
$ 18,672.61
$ 17,897.24
Reported Net Income
(10,603.41)
313.60
6,819.31
Unreported Net Income
$ 16,599.48
$ 18,359.01
$ 11,077.93
*260 During 1943 petitioner received $12,000 from National Screen Service Corporation upon the termination of his employment contract. During 1943 the taxable portion of capital gains realized by petitioner amounted to $675.48. Petitioner failed to report either of these amounts on his 1943 Federal income tax return. Blackwell had cash on hand in the amount of $5,000 on January 1, 1944, in addition to amounts on deposit in bank accounts. He had $2,000 in cash on hand at the end of 1944, 1945, 1946, 1947, 1948, 1949 and 1950 and none at the end of 1951. The deficiencies in income tax for each of the taxable years 1943 to 1946, inclusive, and 1948 to 1951, inclusive, are due in whole or in part to fraud with intent to evade tax. The petitioners' failure to file timely declarations of estimated tax for each of the taxable years 1945, 1949 and 1950 was not shown to be due to reasonable cause. The petitioners' returns for each of the taxable years were false or fraudulent with intent to evade tax. Opinion The petitioner omitted to show on his 1943 return the item of $12,000 received upon termination of his contract of employment with National Screen Service Corporation and an amount *261 of capital gain derived from the sale of certain stocks and bonds. He contends that the contract under which the $12,000 was paid him provided for sale of all the assets of the Independent Poster Exchange and it was his understanding that this payment was for assets rather than services, that he realized no gain upon this sale of assets, that a difficult legal question was involved in determining the taxability of the payment under such a contract and that he in good faith believed that it was not taxable. The omission of the capital gains is explained as involving only an insignificant amount which he overlooked. The respondent says that the petitioner must have known that at least a part of the $12,000 item was compensation for services and should have been reported as income. The 1940 contract of employment had some two years to run when in 1943 it was terminated by an agreement for a lump sum payment in settlement of all sums due him under it. Clearly, at least some part of this was compensation. A similar settlement was held to provide for payment of ordinary income in George K. Gann, 41 B.T.A. 388 (1940). In Elliott B. Smoak, 43 B.T.A. 907 (1941) it *262 was held that a sale of an agency business under different circumstances was the sale of a capital asset and the Gann case was distinguished. If the petitioner was in any doubt as to the taxable status of the $12,000 received in 1943 it is not shown that he sought competent advice as to whether the item should be reported. To the contrary, the testimony is that he omitted to inform his accountant of the receipt of this money when giving information for the preparation of his return. The petitioner's return for 1943 showed a net income of $1,450.45. The amount of capital gains of $675 omitted was not insignificant in comparison. Also, he had reported capital gains in 1942 and therefore was not ignorant of liability for tax thereon. It is plain that the omission of these two items was deliberate and that the returns were false and fraudulent with intent to evade tax. The determination as to 1943 is therefore not barred by the statute of limitations and the deficiency and addition to the tax for that year must be sustained. Section 276(a), Internal Revenue Code of 1939. [1]
*263 The respondent determined the net income for the years 1944 through 1948 of Blackwell and for the years 1949 through 1951 of both petitioners by the net worth and expenditures method. This computation assumes a starting net worth at the beginning of 1944 of $31,150.03, including no cash other than that recorded in bank accounts, and reaches a net worth at the end of 1951 in the amount of $121,312.27, also without cash on hand except for bank balances. According to this computation the petitioner sustained a loss in 1947 larger than that reported on his return. Assets are shown as increasing from $31,170.86 at the beginning to $144,617.44 at the end of the period. Merchandise inventory of the furniture business is shown as $2,636.81 at the beginning of 1945 and increased to $72,495.13 at the end of 1950 and reduced to $65,384.07 at the end of 1951. The net worth computation of the respondent is shown in our findings of fact. Some of the items were stipulated. Others were determined from the evidence. The principal items as to which agreement could not be reached consist of (1) the amount of the allowable reserve for depreciation on automobiles for each of the taxable years; (2) *264 the amount of the petitioners' personal living expenses for each of the years 1944 to 1951, inclusive; and (3) the amount of undeposited cash on hand at the end of each of the taxable years 1943 to 1951, inclusive. In this computation the respondent allowed depreciation on automobiles for each of the years 1943 to 1951 although none was claimed on any return except for 1951. Respondent allowed depreciation upon the stipulated cost figures, with reasonable salvage value estimated and assuming use for business purposes of 50 per cent. Although petitioner contends that more than one car was used for business purposes there is nothing in the record to show a higher ratio of business use than that used by the respondent and we find no sufficient basis for a greater allowance for depreciation. The petitioners contend that the living expenses of the family did not exceed some $3,000 to $3,500 per year during the taxable years. The respondent has estimated living expenses as $4,000 in 1944, $5,000 in each of the years 1945 and 1946, $6,500 in each of 1947 and 1948, $7,000 in 1949, $8,000 in 1950 and $9,000 in 1951. During this period the petitioners owned a residence acquired at a cost *265 of $7,500, expended $5,500 on improvements in 1948, had furniture costing $6,000, and one or more automobiles costing in excess of $2,500. In 1940 Blackwell's salary was over $7,000, in 1941 it was $8,000; in 1942, $9,100; and in 1943 he received $12,000, as well as proceeds of stocks and bonds. With such amounts available we consider it probable that the living expenses exceeded $3,500 in each of the taxable years. In the year 1950 the petitioner paid insurance premiums in excess of $1,200, and in the return for that year claimed $385 for city, county and state taxes paid and $316 for contributions. This is not consistent with the contention that living expenses did not exceed $3,500. A study of the available figures for other years is convincing that the respondent's estimates of living expenses were not excessive and we accept them and have found that such amounts were in fact the nondeductible living expenses in the taxable years. The principal contention of the petitioner relates to the cash on hand at the beginning of 1944. He alleges that at that time he had in his safe deposit box approximately $100,000 in cash, which was accumulated some time before 1936. He argues that *266 since the respondent in computing net worth assumed that the petitioner had no cash on hand at the beginning or end of each year except amounts shown in bank accounts, the entire net worth computation is therefore erroneous and invalid if the petitioner establishes that he had any such cash on hand, and that the evidence he submitted proves that he had the amount alleged. The petitioner is in error in his argument that a showing of some cash on hand on January 1, 1944, in contradiction of the respondent's determination that cash was zero, would invalidate or nullify entirely the deficiencies as determined. He relies upon Holland v. United States, 348 U.S. 121 (1954), requiring the establishment of an opening net worth with reasonable certainty as a starting point from which to calculate future increases in a taxpayer's assets. The respondent has assumed that Blackwell had no cash on hand on the starting date other than that shown in bank accounts. In Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court, the Court of Appeals sustained our finding in a net worth case that the taxpayer had $5,000 in cash at *267 the beginning of the period, not $14,000 to $16,000 as contended by the taxpayer, nor $100 as contended by the Commissioner. In Michael Potson, 22 T.C. 912 (1954) we found that the taxpayer had $100,000 in cash at the beginning of the period, not $259,000 as he claimed nor $15.03 as the Commissioner determined. This was affirmed on appeal sub nom Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). Absolute certitude in the ascertainment of net worth at the beginning of the period is not required, otherwise concealment would form an invincible barrier. United States v. Johnson, 319 U.S. 503 (1943). The petitioner testified in some detail as to the business ventures he undertook while in school and in the years from 1920 through 1935. He professed to have saved some $20,000 or more by about 1925 when he considered buying an established poster exchange for that price before embarking on his own poster exchange business. He also says that about 1934 or 1935 he negotiated with Metro-Goldwyn-Mayer for a contract to operate an advertising accessory department under which he would have to invest $100,000 of his own money and that he then had such *268 an amount in his safe deposit box. The petitioner's story of the existence of a cash hoard in the amount stated and on the particular date is uncorroborated. He maintained no record of the cash in the box and it was not counted in the presence of any witness. One witness who saw money in the box in 1935 could not state how much was in it at that time. Nor would the presence of a specific amount then establish that any substantial sum remained several years later, since the testimony is to the effect that the poster exchange business was becoming unprofitable. Petitioner Leone Blackwell visited the box in 1946 and removed some money, but did not count the cash nor remember how much she removed. The cash then present may have come from other sources, such as cash sales withheld by Blackwell in 1945, and therefore this evidence does not establish to any degree how much cash was present at the beginning of 1944. When the contents of the box were inventoried in October 1951 it contained twelve $100 bills, as well as jewelry, stock certificates, Government bonds, insurance policies, a deed, and various old receipts and letters. The box may have been filled at all times with these non cash *269 items or similar things. The petitioner's contention is to the effect that he enjoyed considerable success in his business ventures until about 1934 and later drew upon his cash reserve while in the furniture business until the reserve was reduced to $1,200 near the end of 1951. The records of the director of internal revenue do not show the filing of a return by Blackwell prior to 1936 and his returns for 1936 through 1942 show no substantial amounts of reported income over living expenses from which such an amount might have been accumulated. Between October 1930 and January 1934 the petitioner borrowed from a local bank in small amounts secured by Liberty bonds. The balance due ranged from $100 to $500 and the notes were renewed from time to time. He paid interest on these loans. This practice is inconsistent with his story of possession of a large hoard of idle cash. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Boyett v. Commissioner, 204 F. 2d 205 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court. When the petitioners bought their home in 1935 they borrowed a large part of the purchase *270 price. They sought a reduction in the interest rate and when refused they borrowed $4,000 from an insurance company to pay off the loan. The second loan remained outstanding until March 1938. If the cash hoard existed it is inconsistent that they should go to the trouble and expense of financing and refinancing this purchase. In the period 1945 to 1951 the petitioner borrowed thousands of dollars from a local bank for use in his business at rates of interest of 6 per cent until July 1945 and 4 per cent thereafter. Such borrowings would be unnecessary if he had hoarded cash in larger amounts available. The financial statements given by the petitioner to the bank in support of his applications for loans do not bear out his story of the hoarded cash. The first such statement, dated March 15, 1945, declared by him to be "within 10% of absolute", shows cash of $18,000 with no cash in banks. At the beginning of 1945 his bank records show about $5,500 in bank balances in personal and business accounts and at the end of the year about $10,600. It shows total assets of $46,000, liabilities of $7,100 and net worth of $38,900 excluding home. If the petitioner had at the beginning of 1944 *271 cash of $100,000 as well as the other assets shown in the net worth statement, excluding home and automobiles, giving a net worth of about $114,000, and he had sustained a net loss for tax purposes of $270 as reported on his return, and living expenses of $3,500 were paid, his net worth on January 1, 1945 would have been in excess of $110,000. His reported income for 1945 was $2,674 and if his living expenses were $3,500 his net worth at the end of that year would have been in excess of $105,000. The financial statement of his assets and liabilities furnished in May 1945 showing a net worth of $38,900 must have omitted over $60,000 of cash. And in that year the evidence indicates that he increased his bank borrowings by $6,500. The petitioner would have us believe that he would borrow a few thousands of dollars at interest when he had much more available cash which was idle and that his statements to the bank in applying for loans omitted a large part of his cash and were false in failing to show his true financial position. As between the statements to the bank and the statements to the Court we consider those made to the bank the more credible. Between the first such statement *272 and the last, given as of the end of 1950, there is disclosed an improvement in net worth of about $79,000 in about five and two-thirds years, not considering $5,500 invested in improving the residence. These indicate a net worth increase comparable to that determined by the respondent. Yet petitioner's returns for the six years 1945 through 1950 report a net loss for tax purposes. The accounting method employed by the petitioner in his furniture business made concealment of income easy and verification impossible. The petitioner received checks or cash in payment of some invoices before the sales were entered on the books and retained the cash. The bookkeeper recorded monthly totals purporting to show the amounts so retained but the supporting invoices were destroyed and any method of corroborating these figures was eliminated. The gross sales figures furnished the accountants for preparation of the tax returns could easily have been understated and the percentage of gross profit on sales appears abnormally low. For example, in the return for 1946 gross sales were reported as $380,000 with profit at less than 2 per cent of this amount at a time when goods were scarce. The petitioner *273 says that he had to pay overceiling amounts to get furniture since he was just entering the business and had to operate at a very low margin, but if overceiling prices were paid they were not concealed by cash payment, since he said that some, at least, were paid through checks. Furthermore, price ceilings were removed early in the years involved. If a potential source for the unreported income is required to be shown, Thomas v. Commissioner, 232 F. 2d 520 (C.A. 1, 1956) it is here present in the petitioner's furniture business. This "likely source" has not been negated by the petitioner. See United States v. Massei, 355 U.S. 595 (1958). The petitioner's practice of withdrawing receipts and retaining the cash is related to his practice of recording amounts as contributions of capital to his business. He said that these contributions came from his safe deposit box. But the respondent has shown in a number of instances that amounts recorded as currency contributions were deposits of all or a part of proceeds of checks received and cashed. It is a fair inference that the petitioner created the appearance of making cash contributions by using funds which were *274 actually business receipts not recorded as such. The petitioner concedes that sales for 1949 and 1950 were understated by $9,000 and $4,000, respectively. The manner in which this understatement was effected is significant. The penciled profit and loss statements found in the safe deposit box were apparently the original ones. That for 1949 showed cash sales of $32,119.56 and computed a net loss from the business. The typed statement which was retained for the business records showed the cash sales as reduced by $9,000 and net income or loss was computed on that basis. In 1950 the first computation showed a profit and the petitioner reduced the cash sales figure by $4,000 thereby reducing the apparent profit to a nominal amount. The figures furnished to the petitioner's accountant for use in preparation of the tax returns showed only the reduced amounts for cash sales. The original penciled statements were kept in the safe deposit box and discovered when the box was inventoried. The petitioner complains that the respondent has failed to investigate the leads given as to the source of the cash on hand. Leads as to the petitioner's earnings prior to 1930 are too remote to be of value. *275 Leads as to his earnings in the 1930's are too vague in nature. While we find incredible the petitioner's statement that he had about $100,000 in cash in his safe deposit box at the beginning of 1944, it is also our opinion that since some money was shown to have been present in the box in 1935, in 1946 and in 1951, the respondent's determination that the petitioner's cash on hand on December 31, 1943, was zero, is questionable. It therefore becomes our duty to determine as nearly as we may from the record the actual amount of cash then present. We have considered the petitioner's earnings in the several years before 1944, his various investments, his approximate living expenses and his probable savings and have found as a fact that he had $5,000 in cash in the same deposit box at the beginning of 1944 and that $2,000 remained on hand at the end of each year thereafter except 1951 when none remained. In the computation necessary under Rule 50, this finding can be given effect and the increases in net worth recomputed from the adjusted starting points. The petitioners allege that the statutory period of limitations bars the assessment of the deficiencies, except as to the year *276 1946, where the period was extended by agreement. The respondent counters that the returns of the petitioners were false and fraudulent with intent to evade tax and hence the assessment may be made at any time, section 276(a), Internal Revenue Code of 1939. Blackwell was convicted on charges of income tax evasion for each of the years 1948 through 1951, in violation of section 145(b), Internal Revenue Code of 1939, the conviction was affirmed on Appeal, Blackwell v. United States, 244 F. 2d 423 (C.A. 8, 1957) and certiorari was denied, 355 U.S. 838 (1957). The respondent takes the position that by reason of the conviction the petitioners may not now deny their liability for the additions to the tax for civil fraud for the four years involved in the criminal case. The respondent specifically pleaded the issue of collateral estoppel as to each of such years. In Eugene Vassallo, 23 T.C. 656 (1955) we held that a conviction for income tax evasion was not res judicata in this Court as to the fraud issue. In Meyer J. Safra, 30 T.C. 1026, 1035 (1958), we held that a petitioner who had been so convicted was not estopped to deny that a *277 portion of the deficiencies was due to fraud with intent to evade tax. The respondent contends that this conclusion was erroneous and requests that it be reconsidered. It is argued that where the burden of proving fraud beyond a reasonable doubt has been met in the criminal case it should follow that the lesser burden of proving fraud by clear and convincing evidence as required in the civil case has been met, citing United States v. Accardo, 113 F. Supp. 783, affd. 208 F. 2d 632 (C.A. 3, 1953), certiorari denied (1954) 347 U.S. 952. We have held that the fact of the trial and conviction of a petitioner is not to be deemed conclusive in a civil suit arising out of the same matter but is evidence to be given weight according to the circumstances. Thomas J. McLaughlin, 29 B.T.A. 247 (1933). In our opinion the record here establishes fraud on the part of Blackwell by clear and convincing evidence as to all the years before us. Therefore it is not necessary to reconsider our opinion in the Safra case, supra. Under the authority of section 276 (a) the deficiencies and additions to tax may be assessed at any time. Our conclusion *278 that fraud has been proved by clear and convincing evidence as to all the years at issue is based upon several factors. We may point to (1) the increase shown in net worth by the petitioner's statements made to his bank which is inconsistent with the tax returns reporting negligible income, (2) the method of accounting of the business under which the petitioner could withdraw cash without making a verifiable record, (3) the uncorroborated statement of the cash hoard which is inconsistent with the petitioner's practice of borrowing at interest when he would have been able to pay cash had the money been at hand, and (4) the conviction of the petitioner of fraud as to certain of the years. See Madeline V. Smith, 32 T.C. 985; Abraham Galant, 26 T.C. 354; Eugene Vassallo, supra. In addition to the affirmative evidence presented which is in our opinion adequate to prove fraud, we may state that we were not persuaded by Blackwell's own testimony in regard to matters in which that was the sole evidence offered. The respondent determined additions to the tax for failure to file a timely declaration of estimated tax for 1945, 1948, 1949, 1950 and 1951, *279 but now concedes that the addition for 1951 was improper. The petitioner contends that the declaration of estimate for 1948 was filed in time. The respondent's exhibit, a certificate of assessments on Form 899, shows that such an estimate was received but fails to show the date of receipt. The petitioner put in evidence a memorandum from the files of his accountant indicating that Form 1040ES for 1948 was filed on March 15, 1948. This being the only evidence of the date of filing, we find that the declaration was timely and the addition to tax for 1948 was erroneous. If the declaration was actually received later, the respondent could have offered proof of that fact but has not done so. The respondent concedes that the additions to tax for substantial underestimate are in error. Decisions will be entered under Rule 50. Footnotes
*. This item appears on "Capital" sheet as "Cash & Check."↩
*. Return also shows loss from the operation of Calkins-Blackwell Company partnership in the amount of $1,640.77. ↩
**. Per original return - amended return reflects net operating loss deduction of $1,210.33, resulting in net profit of $2,315.90.↩
1. Income tax net income - Victory tax net income of $2,157.67. ↩
2. Income tax - Victory tax of $45.09. ↩
3. Per original return - Amended return shows $2,315.90. ↩
4. Per original return - Amended return shows $121.55.↩
1. Sec. 276(a)↩ False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax * * * the tax may be assessed * * * at any time.