MEYER J. SAFRA AND RIVKA SAFRA, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29823.    Filed August 11, 1958.

*A. Louis Mechlowitz, Esq.*, for the petitioners.
*W. Preston White, Jr., Esq.*, for the respondent.

WITHEY, *Judge:* Respondent has determined deficiencies in the income taxes of petitioners and additions to tax under section 293 (b) of the Internal Revenue Code of 1939 for the indicated years as follows:

| Year | Deficiency | Addition to tax | Year | Deficiency | Addition to tax |
|---|---|---|---|---|---|
| 1943 | $6,766.45 | $3,383.22 | 1946 | $10,743.33 | $5,371.67 |
| 1944 | 5,726.73 | 2,863.37 | 1947 | 9,256.38 | 4,628.19 |
| 1945 | 14,051.78 | 7,025.89 | 1948 | 1,600.22 | 800.11 |

The issues presented for our determination are the correctness of the respondent's action in determining (1) that the income of the petitioners was understated for each of the years 1943 to 1948, inclusive; (2) that petitioners are collaterally estopped to deny that some part of the deficiency determined for each of the taxable years here involved was due to fraud with intent to evade tax; and (3) that, in the event that petitioners are not so estopped, some part of the deficiency for each of the years in issue was in fact due to fraud with intent to evade tax.

Additional issues presented by the pleadings have been abandoned by petitioners.

### GENERAL FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioners, husband and wife, residing in Dade County, Florida, filed their joint income tax returns for 1943 to 1948, inclusive, with the collector of internal revenue for the district of Florida. Inasmuch as the activities of Meyer J. Safra are those with which we are here primarily concerned, "petitioner" or "Safra" as hereinafter used has reference to him.

*Issue 1. Deficiency.*

FINDINGS OF FACT.

In 1924 the petitioner, together with his wife, his mother, brother, and 2 sisters, left Russia, the country of his birth, and emigrated to Bucharest, Rumania. Later in that year the petitioners emigrated to Toronto, Ontario, Canada, where they lived for over 1 year. While living in Toronto, Safra was employed for a few weeks as a rabbi at a salary of $10 a week. After petitioner's mother, brother, 2 sisters, and brother-in-law had emigrated to Toronto at his expense, he and his wife moved permanently to the United States in March 1926 and resided in Philadelphia, Pennsylvania, for 3 years. While living in Philadelphia, Safra learned to read and write English and he served as a rabbi to three different congregations at salaries ranging from $20 per week to $35 per week.

In 1929 petitioner and his wife and son moved to Miami, Florida, where he obtained a position as rabbi at a salary of $35 per week. Safra served as a rabbi in Miami for or about 2 years.

In April 1931, Safra went to Chicago where he enrolled in the Northern College of Optometry which he attended for 2 years. During their 2-year stay in Chicago a second child was born to petitioner and his wife. Petitioner was unemployed during the time he spent in Chicago attending the Northern College of Optometry.

After graduating from the Northern College of Optometry, Safra obtained a position as rabbi at Ann Arbor, Michigan, for approximately 4 months at a salary of or about $25 per week.

In 1934 Safra and his wife returned to Miami, Florida, and have resided in Dade County, Florida, since that time. The petitioner passed the examination given by the Florida Optometry Board in 1934 and he subsequently opened his office for the practice of optometry.

In 1943 petitioner went to the office of the collector of internal revenue in Miami, Florida, and inquired as to whether or not he would be required to pay any taxes on money which he had brought into the United States from another country, and he was advised by that office that he would not be liable for any taxes thereon.

During the years 1943 through 1948 Safra received income from his practice as an optometrist and from his practice as a naturopath, treating eye, ear, nose, and throat conditions, rentals from apartment buildings, and the disposition of real estate.

In the fall of 1949 respondent contacted the petitioner and advised him that the income tax returns filed jointly by him and his wife for the years 1947 and 1948 would be audited and investigated. Accordingly, respondent's agent made an appointment with Safra to examine his records. The petitioner appeared at the office of the respondent

and brought only a single-entry ledger which did not contain original entries but only a summary of annual income and expenses which had been entered at the end of each year. The respondent's agent advised petitioner that his records were inadequate. Subsequently Safra returned to respondent's office with his accountant but did not bring additional records. However, the respondent's agent was furnished with a ledger which had been reconstructed by petitioner's accountant who told the agent that he was unable to prove the amount of income received by the petitioner because his records were incomplete.

In February 1950, a special agent entered the investigation and attempted to determine whether or not the petitioner possessed adequate records of his income and expenses. From the records that were furnished the agent by petitioner (a journal, 2 rewritten ledgers, and canceled checks for the years 1947 and 1948), he was unable to verify any of the petitioner's income or expense items. The agent was informed by Safra that he had not maintained any records of the income of his optometry business and he was further informed that petitioner possessed a substantial amount of undeposited cash in his residence. Consequently, the respondent elected to utilize the increase in net worth plus nondeductible expenditures method of reconstructing income.

In the statutory notice of deficiency the respondent determined that the petitioners understated their net taxable income for the years and in the amounts as follows:

| Year | Net income disclosed on return | Correct net income | Under-statement of net income | Year | Net income disclosed on return | Correct net income | Under-statement of net income |
|---|---|---|---|---|---|---|---|
| 1943 | $2,384.43 | $20,572.76 | $18,188.33 | 1946 | $4,977.92 | $30,664.43 | $25,686.51 |
| 1944 | 2,862.06 | 18,367.43 | 15,505.37 | 1947 | 4,979.69 | 26,344.98 | 21,365.29 |
| 1945 | 4,147.40 | 32,524.27 | 28,376.87 | 1948 | 4,987.35 | 12,615.16 | 7,627.81 |

The petitioner maintained a personal checking account at the Mercantile National Bank of Miami Beach, Florida, from December 15, 1943, to April 4, 1946. As of December 31 of each of the years 1943 to 1945, inclusive, the balance in that account was as follows:

| Year | Amount |
|---|---|
| 1943 | $222.74 |
| 1944 | 181.59 |
| 1945 | 2.20 |

From February 4, 1946, through December 31, 1948, the petitioner maintained another bank account at the Mercantile National Bank, Miami Beach, Florida. As of December 31 of each of the years 1946 to 1948, inclusive, the balance appearing in that account was as follows:

|  | Amount |
|---|---|
| 1946 | $698. 32 |
| 1947 | 265. 42 |
| 1948 | 541. 73 |

From September 13, 1943, and continuing through the year 1948, the petitioner maintained a bank account at the Miami Beach First National Bank of Miami Beach, Florida. At the end of each of the years 1943 to 1948, inclusive, the balance appearing in that account was as follows:

| Year | Amount |
|---|---|
| 1943 | $1, 951. 71 |
| 1944 | 771. 87 |
| 1945 | 3, 012. 52 |
| 1946 | 370. 20 |
| 1947 | 54. 77 |
| 1948 | -------- |

The petitioners maintained a bank account at the First National Bank of Miami, Miami, Florida, from June 28, 1947, through December 31, 1948. At the end of the years ended December 31, 1947 and 1948, the balance in that account was as follows:

| Year | Amount |
|---|---|
| 1947 | $0. 54 |
| 1948 | 627. 52 |

During the year ended December 31, 1942, petitioner maintained a bank account at the Florida National Bank, Miami, Florida, and a special checking account at the Miami Beach First National Bank, Miami Beach, Florida. The balance appearing as of December 31, 1942, in the account maintained at the Florida National Bank was $111.09 and the balance in the special checking account in the Miami Beach First National Bank as of December 31, 1942, was $12.25.

At the end of each of the years 1942 to 1948, inclusive, petitioner had merchandise inventory in the amounts as follows:

| Year | Amount |
|---|---|
| 1942 | $4, 356. 00 |
| 1943 | 8, 323. 00 |
| 1944 | 8, 973. 00 |
| 1945 | 8, 343. 00 |
| 1946 | 8, 516. 00 |
| 1947 | 9, 159. 45 |
| 1948 | 10, 650. 00 |

At the end of each of the years 1942 to 1948, inclusive, petitioner had office equipment in the amounts as follows:

| Year | Amount |
|---|---|
| 1942 | $1, 200. 00 |
| 1943 | 1, 200. 00 |
| 1944 | 1, 200. 00 |
| 1945 | 1, 200. 00 |
| 1946 | 1, 200. 00 |
| 1947 | 1, 396. 25 |
| 1948 | 1, 559. 95 |

At the end of each of the years 1942 to 1948, inclusive, petitioner owned Government bonds as follows:

| Year | Amount |
|------|--------|
| 1942 | $93. 75 |
| 1943 | 75. 00 |
| 1944 | ------ |
| 1945 | 262. 50 |
| 1946 | ------ |
| 1947 | ------ |
| 1948 | ------ |

The petitioner kept in a money belt and in a piece of ¾-inch water pipe in his clothes closet a substantial amount of cash which he had brought with him at the time he entered the United States and had never deposited in a bank. As of December 31, 1942, the petitioner had in his possession undeposited cash in the amount of $85,000. He gradually brought his undeposited cash into circulation by borrowing as much as he could upon purchasing parcels of real estate and subsequently discharging the outstanding mortgages and promissory notes with cash withdrawn from his cash hoard. The petitioner began to circulate his undeposited cash extensively in this manner in 1943. Since January 1, 1943, the petitioners have executed promissory notes and real estate mortgages on the dates and in the amounts as follows:

| Date of note and mortgage | Face amount |
|---------------------------|-------------|
| Dec. 8, 1943 | $5, 000. 00 |
| Dec. 8, 1943 | 14, 544. 35 |
| June 8, 1944 | 8, 000. 00 |
| June 28, 1944 | 14, 000. 00 |
| Apr. 12, 1946 | 9, 000. 00 |
| Apr. 12, 1946 | 58, 200. 00 |
| Apr. 24, 1946 | 38, 000. 00 |
| June 23, 1947 | 7, 700. 00 |

In addition to the foregoing, during the period from December 6, 1943, to June 5, 1947, the petitioner borrowed the total amount of $80,750 from the Miami Beach First National Bank, Miami Beach, Florida, on open account. Further, from April 29, 1946, to October 30, 1947, he borrowed the total amount of $33,000 from the Mercantile National Bank, Miami Beach, Florida, on open account.

The majority of the foregoing loans, both secured and unsecured, were repaid with interest at a time considerably in advance of their maturity.

During each of the years 1943 to 1947, Safra executed a sworn financial statement in connection with his application for a bank loan. In those statements the petitioner disclosed the amount of his cash and net worth as follows:

| Date | Cash in hand and banks | Net worth | Date | Cash in hand and banks | Net worth |
|---|---|---|---|---|---|
| Dec. 3, 1943 | $7,500 | $48,000 | Apr. 4, 1946 | $35,000 | $124,500 |
| May 31, 1944 | 13,300 | 63,600 | May 5, 1947 | 3,000 | 168,000 |
| Feb. 13, 1945 | 2,000 | 90,800 | | | |

The petitioner made payments out of undeposited cash on outstanding real estate mortgages and promissory notes during the years and in the amounts as follows:

| Year | Amount |
|---|---|
| 1943 | $3,000 |
| 1944 | 6,151 |
| 1945 | 19,117 |
| 1946 | 18,916 |
| 1947 | 37,816 |

On the following dates the petitioner had undeposited cash on hand in the indicated amounts:

| Date | Amount |
|---|---|
| Jan. 1, 1943 | $85,000 |
| Dec. 31, 1943 | 82,000 |
| Dec. 31, 1944 | 75,849 |
| Dec. 31, 1945 | 56,732 |
| Dec. 31, 1946 | 37,816 |
| Dec. 31, 1947 | ------ |
| Dec. 31, 1948 | ------ |

Petitioner's reserve for depreciation for the years 1942 to 1948, inclusive, as stipulated by the parties was as follows:

| | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 | 1948 |
|---|---|---|---|---|---|---|---|
| Buildings | $1,658 | $1,939 | $3,304 | $6,544.80 | $6,870 | $8,957.10 | $14,424.01 |
| Office furniture | 600 | 720 | 840 | 960.00 | | | |
| Office equipment | | | | | 1,080 | 1,219.63 | 1,243.35 |

### OPINION.

The respondent has determined petitioners' income by the increase in net worth plus nondeductible expenditures method and thereby has determined that their taxable income as reported on their returns was understated.

The petitioners contend that the increases in net worth reflected in the net worth statement prepared by the respondent are attributable to the expenditure of undeposited cash on hand as of January 1, 1943, for which the respondent gave them no credit in the net worth statement.

The petitioner asserts that on January 1, 1943, he had in his possession $145,000 in bills of $500 and $1,000 denominations which he

had brought with him to Toronto, Ontario, Canada, from Bucharest, Rumania, in 1924. Safra's explanation of the method of acquiring his cash hoard is unique. He testified that in 1919, at the age of 19, he obtained a position as assistant to the assistant superintendent in a 350-bed hospital in Elisretgrad, Russia. In addition to his salary, he stated that he was able to accumulate substantial amounts of cash, jewelry, and other valuables by appropriating unclaimed personal property found in the possession of deceased persons who had died while under treatment in the hospital. Further, upon being promoted to superintendent of the hospital, Safra testified that it was his responsibility to purchase food supplies for the patients and that he was able to reap a substantial personal profit from the cash allotments made available by the hospital for such purchases. After termination of his employment as superintendent of the hospital, the petitioner stated that he joined the Russian Cheka, or secret police, and while traveling throughout the country he made a considerable profit by purchasing and reselling currency in the various provinces.

According to petitioner's testimony, he left Russia by way of the underground in 1924, together with his wife, mother, brother, and 2 sisters, and emigrated to Bucharest, Rumania. He testified that he sold most of his jewelry and exchanged his Russian currency into United States and Canadian currency while staying in Bucharest. He further testified that he concealed his currency in the lining of his suitcase, between the pages of books, and in a money belt which he wore around his waist, during his trip from Bucharest, Rumania, to Toronto, Canada, in 1924. He stated that he had between $180,000 and $200,000 in currency in 1924.

Joseph Shaffer, petitioner's brother-in-law, and a cousin of petitioner Rivka Safra, testified that he counted between $120,000 and $140,000 in 1924, while assisting the petitioner in packing the money in the lining of his suitcase in Bucharest. Because of the obvious bias of Joseph Shaffer, however, and because of the remoteness in time between the trial herein and the occasion to which his testimony refers, we are unable to rely fully upon his testimony.

Benjamin Friedman, whose testimony as given before the United States District Court for the Southern District of Florida was admitted herein by stipulation, testified that in 1925 the petitioner showed him a bundle of $500 bills and a bundle of $100 bills in the city of Toronto, Ontario, Canada. Friedman, however, did not count any of the money he stated he had seen and consequently his testimony is of little value.

Henry Daverman, a friend of Safra's whom he had offered to assist in setting up in business, testified that in 1938 in New York City he (Daverman) counted $50,000 which the petitioner took from a belt around his waist. Daverman further stated that he saw more

money in the petitioner's possession at that time which he did not count.

Rabbi Hirsch Horowitz testified that in 1942 the petitioner brought to him in Miami Beach, Florida, a belt containing a sizable amount of cash which he did not count but which he laid his hands upon for the purpose of pronouncing a blessing thereon. Rabbi Horowitz stated that he saw some $500 bills but did not count the money because of the provisions of Talmudic law, according to which the effectiveness of clerical blessing would have been destroyed by counting or evaluating the temporal accumulation. We think the testimony of this witness is credible.

Samuel Daverman, a friend of petitioners', was stationed near Miami Beach, Florida, as a member of the United States Air Force in 1943. Daverman had had considerable training as an accountant and he also had had some experience in that field. He was a frequent visitor in the home of the petitioners' during 1943, visiting them several times a week. The petitioner discussed some of his financial problems with Daverman and when he expressed disbelief at the size of petitioner's claimed cash accumulation, Safra took a length of pipe from his clothes closet and removed a money belt from around his waist and deposited their cash contents on the table. Daverman testified that he personally counted $80,000 in cash during May 1943 and stated further that there definitely was more cash in the accumulation contained in the pipe and money belt which he did not count. He did not estimate, however, the amount of the additional uncounted cash.

Because of the petitioner's manner of testifying and demeanor on the witness stand, together with certain discrepancies in his testimony, we are unable to accept his story in many of its aspects. We are not convinced from the record that Safra actually possessed undeposited cash in the amount of $145,000 on January 1, 1943. However, the facts that petitioner was able to finance the transportation of his mother, brother, 2 sisters, and brother-in-law from Bucharest, Rumania, to Toronto, Ontario, Canada, in 1925; that he was able to support himself, his wife, and family of 2 children from 1925 to 1934 while being employed only periodically at a nominal salary; that he moved from Toronto to Philadelphia, Pennsylvania, to Miami, Florida, to Chicago, Illinois, and back to Miami; and that he was able to attend for 2 years the Northern College of Optometry in Chicago, Illinois, without earnings, all indicate that he at those times possessed funds in a substantial amount. On the basis of the extraneous and apparently unbiased testimony of Henry Daverman who counted $50,000 worth of petitioner's cash accumulation in 1938, the testimony of Rabbi Horowitz who saw and laid his hands upon a substantial cash accumulation brought to him by peti-

tioner in 1942, and the supporting testimony of Samuel Daverman who counted $80,000 of petitioner's cash in 1943, we are persuaded that the petitioner had undeposited cash on hand in the amount of $85,000 as of January 1, 1943.

The petitioners have not attempted to establish the amount of undeposited cash on hand at the end of each of the years in issue. Nor have they shown the amount of such cash that was expended during those years for assets listed on the net worth schedule prepared by respondent. However, the petitioner testified that in 1943 he began to circulate extensively his undeposited cash by borrowing as much as he could upon acquiring real estate and subsequently discharging the notes and mortgage obligations with cash withdrawn from his cash hoard. Since there is no evidence in the record that any cash was expended by the petitioner for any purpose other than payments on notes and mortgages, we have determined in our findings of fact the amount of the payments made in each year out of undeposited cash in an amount equal to the annual reduction in outstanding notes and mortgages, and we have determined the amount of undeposited cash on hand at the end of each year accordingly.

## Issue 2.   *Collateral Estoppel.*

### FINDINGS OF FACT.

On April 3, 1952, Meyer Safra was indicted for willfully and knowingly attempting to evade a portion of the Federal income tax due and owing by him for the years 1945 to 1948, inclusive, by filing false and fraudulent income tax returns for the foregoing years in violation of section 145 (b) of the Internal Revenue Code of 1939. After a trial by jury in the United States District Court for the Southern District of Florida, Miami Division, in the case of *United States of America* v. *Dr. Meyer J. Safra*, the petitioner was found guilty on all counts as charged in the indictment for each year. On February 20, 1956, the United States District Court for the Southern District of Florida, Miami Division, entered its judgment to the effect that Safra had been convicted of attempting to defeat and evade a portion of his income taxes due for the years 1945 to 1948, inclusive, by filing false and fraudulent returns for those years; that he was guilty as charged and convicted; that he pay the United States a fine in the amount of $1,000; and that he be committed for imprisonment for a period of 1 year, but that the confinement sentence be suspended. No appeal was taken from this judgment.

### OPINION.

In his amended answer, the respondent has asserted that inasmuch as the petitioner was convicted in the United States District Court

for the Southern District of Florida of attempting to defeat and evade a portion of his income taxes for 1945 to 1948, inclusive, he is collaterally estopped from litigating in the Tax Court the correctness of the respondent's action in determining additions to tax for fraud under section 293 (b) of the 1939 Code. If the respondent's position is correct, the question raised by the pleadings of whether or not a part of the deficiencies determined herein was due to fraud with intent to evade tax is not properly before us, and we are without jurisdiction to determine the existence or nonexistence of fraud in any case in which the taxpayer previously has been convicted of tax fraud in a United States District Court.

In *Helvering* v. *Mitchell*, 303 U. S. 391, the Supreme Court held that an acquittal in a United States District Court under an indictment charging the taxpayer with willfully attempting to evade or defeat tax under section 146 (b) of the Revenue Act of 1928 was not a bar to the assessment by the respondent of an addition to tax for fraud under section 293 (b) of the Revenue Act of 1928. The Supreme Court pointed out that sections 146 (b) and 293 (b) of the Revenue Act of 1928, providing penalties and additions to tax for criminal and civil fraud, are essentially different in character, were enacted for wholly different purposes, and differ widely in their language. To hold, therefore, as the respondent contends, that a jury conviction for willful evasion of tax under section 145 (b) of the Internal Revenue Code of 1939 estops the taxpayer from petitioning the Tax Court to redetermine the correctness of the respondent's action in determining additions to tax under section 293 (b) of the Code would appear to be inconsistent with the holding of the Supreme Court in *Helvering* v. *Mitchell, supra.*

An issue similar, if not identical, to the one here presented was raised in *Eugene Vassallo*, 23 T. C. 656, where the respondent submitted a motion for judgment by estoppel as to the question of fraud based on the conviction of the taxpayer for criminal fraud in the United States District Court. We there held that the taxpayer's conviction under section 145 of the 1939 Code was not res judicata in proceedings before the Tax Court.

We are aware of no decision which holds that a conviction for criminal fraud in a United States District Court estops a taxpayer from denying a determination of additions to tax for fraud in a Tax Court proceeding, and respondent has cited none. We therefore are of the opinion that our decision in *Eugene Vassallo, supra,* is dispositive of this issue and we accordingly hold that the petitioner is not collaterally estopped to deny that a portion of the deficiencies herein was due to fraud with intent to evade tax.

## *Issue 3. Fraud.*

### FINDINGS OF FACT.

The petitioner's records consisted of a single-entry ledger which did not contain original entries but disclosed a summary of annual income and expenses which had been entered at the end of each year. Safra did not maintain records of his optometry business.

The petitioners understated their net income on their Federal income tax returns for each of the years ended December 31, 1943, to December 31, 1946, inclusive, and the year ended December 31, 1948, by at least the following amounts:

| Year | Amount |
| --- | --- |
| 1943 | $10, 169. 00 |
| 1944 | 3, 926. 00 |
| 1945 | 5, 035. 00 |
| 1946 | 4, 178. 00 |
| 1947 | ----------- |
| 1948 | 6, 374. 31 |

A portion of the deficiency for each of the foregoing years is due to fraud with intent to evade tax.

### OPINION.

The final question presented for our determination is whether the understatements of gross income by petitioner for 5 of the 6 years in issue were in fact due in whole or in part to fraud with intent to evade tax.

A strong indication of petitioner's intention is found in the consistent pattern of understatements of income over a period of years. For the years 1943, 1944, 1945, 1946, and 1948, petitioners understated their net income on their Federal income tax returns in amounts ranging from $3,926 to $10,169 each year. The understatements of income were so consistent and of sufficient magnitude as to preclude the inference that they were omitted due to oversight.

Moreover, petitioner's records consisted only of a single-entry ledger containing a summary of annual income and expenses which had been entered at the end of each year. No records were maintained by the petitioner in connection with his optometry business. The failure on the part of petitioner to maintain adequate books and records, when coupled with other evidence of record, provides convincing evidence of his fraudulent intention to evade taxes. *Arlette Coat Co.*, 14 T. C. 751.

Accordingly, on the basis of the foregoing evidence, we are convinced that some portion of the deficiency determined for each of the years was due to fraud with intent to evade tax.

With respect to the liability of Rivka Safra on the joint income tax returns filed with Meyer Safra for each of the years in issue, where a taxpayer is guilty of fraud in failing accurately to report income for a given taxable year and, for that year, the taxpayer and his wife filed a joint income tax return, the spouses are jointly and severally liable for the entire tax, together with additions thereto. *Myrna S. Howell*, 10 T. C. 859, affd. 175 F. 2d 240. The consequences of the filing by Meyer Safra of the fraudulent income tax returns for 1943, 1944, 1945, 1946, and 1948 therefore attach to Rivka Safra as well.

*Decision will be entered under Rule 50.*