William J. Powers, Jr., and Esther B. Powers v. Commissioner.
Powers v. Commissioner
Docket No. 81513.
United States Tax Court
T.C. Memo 1962-5; 1962 Tax Ct. Memo LEXIS 301; 21 T.C.M. (CCH) 17; T.C.M. (RIA) 62005; January 15, 1962
William J. Powers, Jr., pro se, 1200 N. Madison St., Rome, N. Y. John J. O'Toole, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in tax and additions to such tax: Additions to Tax
Section
Section
Section
Year
Income Tax
293(b) [1]
294(d)(1)(A)
294(d)(2)
1948
$ 795.58
$ 397.79
$ 46.72
1949
3,896.34
1,948.17
240.60
1950
2,675.94
1,337.97
160.38
1951
2,921.04
1,460.52
185.22
1952
32,361.56
16,180.78
1,943.86
1953
5,725.28
2,862.64
$552.03
368.03
1954
4,136.21
2,068.11 *
420.95
273.06
1956
1,151.22
*302 The parties have now agreed upon deficiencies and an addition for the years 1954 and 1956 as follows: Addition to Tax
Section
Section
Year
Deficiency
294(d)(1)(A)
294(d)(2)
1954
$2,618.20
$212.30
1956
211.60
The principal issue for our decision is whether the returns filed for the years 1948-1953, inclusive, were false and fraudulent with intent to evade the tax. Dependent on this issue is the question whether assessments for the years 1948-1953 are barred by the statute of limitations or are still permitted by reason of the filing of false and fraudulent returns. Some of the facts have been stipulated and are so found. Petitioners are husband and wife residing in Rome, New York. Their joint Federal income tax returns for the years here involved were filed with the district director of internal revenue at Syracuse, New York. William J. Powers, Jr., will be hereinafter referred to as petitioner; his wife will be referred to as Esther; jointly they will be referred to as petitioners. Petitioner during all the years in issue was an attorney practicing law in Rome, New York. Esther assisted him in his law office as secretary and stenographer. *303 His practice was concerned mostly with negligence cases, with some preparation of wills and other general practice. Petitioner was admitted to the Bar of the State of New York in 1926 and from 1927 to 1943, petitioner and his father practiced in Rome under the firm name "Powers and Powers." Since 1943 petitioner has practiced on his own. Petitioner reported the following amounts (rounded to the nearest dollar) of gross and net income from the practice of law, interest, and dividends for the years 1948-1953, inclusive: Divi-
Year
Gross
Net
Interest
dends
1948
$5,261
$2,416
$173
$1,070
1949
5,311
2,080
186
1,298
1950
5,120
1,842
272
1,471
1951
5,240
1,674
278
1,776
1952
5,370
2,765
319
2,675
1953
5,486
2,536
324
4,056
For 1948 through 1951, Esther reported salary in the amounts of $900, $1,200, $1,300, and $1,100, which amounts were deducted in arriving at the "Net" figures shown above. Petitioner and Esther were married in 1927 and soon thereafter moved to Rome where petitioner practiced law with his father. Prior to this time Esther had been living in Canaan, New York, with her mother, Rhoda Berry (hereinafter *304 referred to as "Rhoda"), and her stepfather, Arza Berry. The Berrys operated a thriving and profitable resort hotel and tavern in Canaan, a popular vacation community in the Berkshire Mountains in eastern New York State. At this hotel the Berrys gave frequent, large banquets, and operated a bar which was especially prosperous during the Prohibition era. Several slot machines were also operated. Rhoda died in January 1945 and Arza died in July of the same year. During the period between 1927 and 1945 petitioners visited Canaan and the Berrys almost every week end and Rhoda often came to Rome to visit them. Esther was Rhoda's only child. Rhoda was apprehensive that Arza (who was a rather heavy consumer of alcoholic beverages) would squander the large profits which the hotel was earning, consequently during the period of 1927-1945, she made frequent large cash gifts to Esther and sometimes to petitioner for the benefit of both. These gifts were made both in Canaan and Rome, averaged from $5,000 to $6,000 per year, and were usually given in odd amounts. Esther turned all this money over intact to petitioner who changed it into larger bills, put the bills into bank wrappers and kept *305 this money first in a box, then in an old safe inherited from his grandfather, then in various safety deposit boxes. Finally, in 1943, he purchased a safe which he put in a bedroom in his home and the money was kept in it thereafter. William, Sr., separated from his wife in 1925 and lived with petitioner and Esther in their home from 1927 until 1938, paying most of the household expenses during these years, including the rent. He also allowed petitioner to retain 50 percent of the profits from their law practice during these years and, in addition, made certain cash gifts to him. Petitioner's paternal grandmother gave him about $500 upon his graduation from law school in 1925. Petitioner's paternal aunt, Kathleen Powers Palmer, was bedridden with a serious illness from 1927 until her death in 1938. She lived in the home of her mother (petitioner's grandmother) in Rome and required close and constant personal attention during all these years. Petitioner contributed his assistance by visiting his grandmother's house almost daily to help care for his aunt. In appreciation of petitioner's kindness, his grandmother gave him numerous small cash gifts until her death in 1933. Furthermore, *306 her will left petitioner a specific bequest of $1,000, a house, which he sold in 1945 for $5,750, and named him residuary legatee. Under the residuary clause, petitioner inherited numerous antiques, which he sold for a price in excess of $1,500, and the law library which had belonged to his grandfather. Petitioner was also the beneficiary of a $500 insurance policy on his grandmother's life. During the years 1931 to 1948 petitioner made the following cash withdrawals from his savings accounts: The Farmers
National Bank
The Rome
Date
& Trust Company
Savings Bank
Jan. 4, 1937
$ 175.91
May 13, 1937
638.35
Oct. 20, 1937
2,000.00
Dec. 30, 1937
4,900.00
Mar. 31, 1938
1,800.00
May 2, 1938
4,000.00
July 1, 1938
797.00
Sept. 26, 1938
$ 945.44
Jan. 9, 1939
70.00
50.00
Jan. 8, 1940
131.86
88.83
July 31, 1940
1,000.00
Jan. 29, 1942
80.14
113.96
Mar. 2, 1944
165.40
July 2, 1945
6,515.17
The following is a description of petitioner's purchases of real estate and real estate mortgages: Source of Purchase Funds
Mortgages (Fee pur-
Date of
Checking
Savings
Cash
chases indicated by
Purchase
Total Cost
Account
Account
on Hand
asterisk)
Blowers
10/ 2/31
$ 125.00
$ 125.00
Heffner
5/ 2/38
4,000.00
$4,000
1509 N. Madison *
7/24/39
3,400.00 **
$ 700
Ethridge
9/ 1/41
3,500.00
3,500.00 ***
519 N. Madison *
10/23/42
8,000.00
500
100.00
7,400.00 ***
Cooney
6/23/43
600.00
600.00
Herring
5/ 6/44
1,300.00
1,300.00
Mahoney
8/ 8/44
2,600.00
2,600.00 ***
Parks Hotel * (1/2
10/31/44
12,300.00
1,000
11,300.00 ***
interest)
Griffin
1/29/45
500.00
500.00
Hoehn
5/10/45
2,150.00
2,150.00
4,800.00
800
4,000.00 ***
800 N. George St. *
6/18/45
9,500.00
3,000
6,500.00
Pelton
6/29/46
2,000.00
2,000.00
Carello
1/18/47
6,500.00
2,000
4,500.00
Gross
2/26/48
3,000.00
3,000.00
(Reichenbacher)
Lynch (Sabin)
2/28/48
2,170.00
2,170.00
Carello
3/29/48
2,451.50
2,451.50
Totals
$8,000
$4,000
$54,196.50
*307 Petitioner also obtained cash from the payments in satisfaction of certain of the above mortgages and from sales of certain real estate as described below: Date of
Mortgage Sold * (Fee
Satisfaction
Amount
Disposition
Interest Indicated By
Acquisition
or Sale
Received
of Proceeds **
Asterisk)
419 Floyd *
1933
8/ 8/45
$ 3,000 ***
$ 3,000
(Inheritance)
Heffner
5/ 2/38
7/ 5/39
4,000
4,000
1509 N. Madison *
7/24/39
1/26/46
4,000
4,000
Herring
5/ 6/44
8/ 8/46
1,300
1,300
Mahoney
8/ 8/44
4/29/46
2,600
2,600
800 N. George *
6/18/45
11/ 1/46
16,500
16,500
$31,400
$31,400
Respondent's agents first began *308 an investigation of petitioners' returns in April 1955. Petitioner produced no books, and the agents determined that the use of the net worth plus nondeductible expenditures method was necessary to clearly reflect his income since he had destroyed the manila office papers, on which he recorded office receipts and expenditures, shortly after preparation of his returns each year. Petitioner at this time described to the agents the various gifts (mentioned above) which he had received prior to 1948. Esther's affidavit was submitted in support of petitioner's narrative of the gifts from Rhoda, and the agents originally proposed a net worth statement which would show no opening balance of cash-on-hand. Petitioners have at all times steadfastly maintained that they had cash-on-hand (in the bedroom safe) and $125,000 on January 1, 1948. After further conferences with petitioners in 1958, respondent's agents yielded on this point to the extent of allowing opening cash-on-hand of $2,500, keeping this amount constant for the years beginning January 1, 1948, through January 1, 1953, inclusive. Respondent also determined a cash-on-hand balance as of December 31, 1953, the end of the net worth *309 period, of $10,493.33. The parties are now agreed as to all items in respondent's proposed net worth reconstruction except the amount of cash-on-hand for all years and the resultant understatements of net income. Such proposed reconstruction, using the opening and yearly cash-on-hand figures proposed by respondent, is as follows: William J. Powers, Jr., and Esther B. Powers
Net Worth and Nondeductible Expenditures
1948-1953
1/1/48
12/31/48
12/31/49
12/31/50
Cash on Hand
$ 2,500.00
$ 2,500.00
$ 2,500.00
$ 2,500.00
Other Assets
101,735.80
104,046.63
118,690.88
130,564.15
Reserves
2,220.00
2,656.67
3,093.34
3,819.51
Net Worth
$102,015.80
$103,889.96
$118,097.54
$129,244.64
Less: Net worth end of
preceding year
102,015.80
103,889.96
118,097.54
Increase
$ 1,874.16
$ 14,207.58
$ 11,147.10
Personal Living Expenses
4,000.00
4,000.00
6,430.44
Personal Nondeductible
Gifts
Total
$ 5,874.16
$ 18,207.58
$ 17,577.54
Less: Nontaxable bond
interest
750.00
750.00
750.00
Adjusted Gross Income
$ 5,124.16
$ 17,457.58
$ 16,827.54
Specific, or Optional De-
duction
691.06
1,000.00
1,000.00
Net Income, Corrected
$ 4,433.10
$ 16,457.58
$ 15,827.54
Net Income, Per Return
3,619.45
3,807.29
3,902.24
Understatement of Net In-
come
$ 813.65
$ 12,650.29
$ 11,925.30
*310 William J. Powers, Jr., and Esther B. Powers
Net Worth and Nondeductible Expenditures
1948-1953
12/31/51
12/31/52 *
12/31/53
Cash on Hand
$ 2,500.00
$ 2,500.00
$ 10,493.33
Other Assets
142,367.87
199,715.69
199,187.98
Reserves
4,545.68
5,287.05
6,042.28
Net Worth
$140,322.19
$196,928.64
$203,639.23
Less: Net worth end of
preceding year
129,244.64
140,322.19
196,928.64
Increase
$ 11,077.55
$ 56,606.45
$ 6,710.59
Personal Living Expenses
8,434.34
6,825.95
5,032.41
Personal Nondeductible
Gifts
7,737.45
Total
$ 19,511.89
$ 63,432.40
$ 19,480.45
Less: Nontaxable bond
interest
218.75
Adjusted Gross Income
$ 19,293.14
$ 63,432.40
$ 19,480.45
Specific, or Optional De-
duction
1,000.00
1,000.00
1,000.00
Net Income, Corrected
$ 18,293.14
$ 62,432.40
$ 18,480.45
Net Income, Per Return
3,827.93
3,635.29
5,440.03
Understatement of Net In-
come
$ 14,465.21
$ 58,797.11
$ 13,040.42
Prior to the 1958 *311 conferences at which respondent attempted to determine civil liability, the main efforts of respondent's office and the Department of Justice were directed toward criminal prosecution of petitioners. An indictment was returned on January 29, 1957, against both petitioners in five counts (years 1950 to 1954, inclusive) for filing false and fraudulent returns with intent to evade and defeat the tax. Petitioner had suffered a coronary thrombosis in 1953 which kept him away from his office for several months, nevertheless he prepared to defend the criminal case himself but was advised by doctors at the Leahy Clinic in Boston that this effort could well be fatal since, in their opinion, he could not stand the rigors of a trial in which he personally was involved. Thereafter, on May 27, 1957, petitioner pleaded guilty [2] to counts four and five of the indictment (tax years 1953 and 1954) and the other counts were dismissed. All counts against Esther were dismissed. On April 14, 1958, petitioners and respondent executed a consent *312 in writing to extend the prescribed period of limitations for the year 1954 pursuant to section 6501(c)(4) of the 1954 Code. Petitioners did not file an estimated tax return for 1954. We find as ultimate facts that petitioners had $125,000 cash-on-hand in their bedroom safe on January 1, 1948, and from that time forward through 1953 requisite parts of it were spent or used to purchase other assets by petitioners, thus accounting for the apparent unreported increases in petitioners' net worths and that no part of any deficiency for the years 1948-1953, inclusive, was due to the filing of false and fraudulent returns with intent to evade the tax. In this case the respondent has employed the so-called net worth plus nondeductible expenditures method in reconstructing petitioners' income, and the only dispute now remaining between the parties is the opening balance of cash-on-hand. As is often the case, we must decide whether petitioners kept on their premises a large, uninvested supply of currency. Respondent has seen fit to devote his entire energies on brief to the single argument that one alleged event which occurred 13 years before the trial was denied by two of its principals *313 and, in any event, was so outlandish as to merit only disbelief. As a consequence, respondent's brief has been of little help. The alleged event will be described later. We note here that it neither proves nor disproves the one ultimate fact which we must here decide, i.e., the existence and the amount of the cash hoard on January 1, 1948. Upon the issue of fraud the burden of proof is upon the respondent. Fraud is a question of fact. It is never presumed but must be shown by clear and convincing evidence. Archer v. Commissioner, 227 F. 2d 270, affirming a Memorandum Opinion of this Court; Frank Imburgia, 22 T.C. 1002, 1014; W. A. Shaw, 27 T.C. 561, affd., 252 F. 2d 681. As the Supreme Court has cautioned us in the leading case of Holland v. United States, 348 U.S. 121 (1954), the net worth method of reconstructing income is at best an approximation and is fraught with uncertainties.[3] Accordingly, on the issue of fraud where respondent must carry the burden of establishing his proof by clear and convincing evidence ( M. Rea Gano, 19 B.T.A. 518 (1930)) we must be careful not to leap too hastily to *314 conclusions based on apparent unexplained increases in net worth. Furthermore, the crucial item in all such cases is the opening net worth. United States v. O'Connor, 237 F. 2d 466 (C.A. 2, 1956). If this is not established with reasonable certainty the Government's entire case falls. As the Holland decision points out, it is virtually impossible in many situations for respondent to negate, many years subsequent to its alleged existence, a cash hoard. Thus, there are obvious limitations upon the proof that should be required of the Government. Yet, since it bears a heavy burden of proof, it is mandatory that the Government investigate all leads reasonably susceptible of being *315 checked for accuracy. This must be done before we can hold that respondent has disproved the taxpayer's story. Holland v. United States, supra.The Holland decision demonstrates an effective means by which in a proper case the Government can so disprove the taxpayer's allegations. However, here respondent has done nothing to ascertain the correctness of petitioners' explanations. An agent testified to the effect that he selected the $2,500 cash-on-hand figure simply because he generally disbelieved petitioners' explanations and the affidavits submitted in support of them. One of petitioners' affidavits listed in excess of 26 persons (or families) who were regular patrons of Rhoda's hotel. These parties might have given respondent information about the hotel and its popularity, but the record does not show any effort to locate any of these persons. Nor has respondent otherwise placed any doubt in our minds as to the authenticity of petitioners' story that the hotel was very successful. We further find it quite plausible that Rhoda would have passed most of the hotel's profit on to her only offspring, the one natural object of her bounty. A credible witness who was not *316 a member of petitioner's family testified that he often saw Rhoda give Esther large sums in cash. Respondent has thus failed to negate the major source of the alleged hoard. We think that the least respondent could have done would have been to produce the Federal income tax returns of petitioner (for the years prior to 1948) and of his father. Cf. Holland v. United States, supra. The record indicates that William, Sr., paid most of petitioner's household expenses prior to his 1943 death and also gave petitioner a 50 percent share in the profits of the father's law practice starting in 1927 when petitioner was only 1 year out of school. The record indicates that William, Sr.'s practice was quite successful. Thus, it could well be that these circumstances eliminated a major drain upon petitioner's earnings and thus provided more initial cash at the start of the net worth period. On the question of fraud, we cannot lightly assume otherwise. Likewise, respondent has not exerted the slightest effort to disprove the gifts from petioner's father and grandmother. We perceive no need to trace the many gifts which respondent has failed to dispute into a possible cash hoard *317 at the start of 1948. Suffice it to say that the record supports a finding that Rhoda's consistent and large cash gifts to petitioners, of themselves, created most of it. It is altogether possible that the other gifts together with petitioner's unknown, and possibly large, earnings and small living expenses prior to 1948 were adequate to create the approximately $100,000 of other (noncash) assets on January 1, 1948. It is also of some significance (although, of course, not controlling) that respondent has shown no other business or activity of petitioners which could have produced the alleged large earnings and that his investigation of petitioner's law practice and interviews of petitioner's clients were futile in this regard. The cash hoard defense to a net worth fraud case is almost always used, and it is right that in this day of Federally insured savings banks and other relatively safe investments, that it should always be suspect. We approach petitioners' defense in this case with that suspicion and consider as quite significant, and the strongest single aspect of their case, the fact that petitioner habitually used cash in large amounts in his purchases of real estate and *318 real estate mortgages. This is indeed unusual and strongly supports the cash hoard defense. Such transactions started in 1931 and occurred with significant frequency and amount between 1941 and 1948, inclusive. All of petitioners' evidence in this regard is well documented and uncontested on respondent's part. We realize that the "roll-overs" indicated by the table of mortgage payments and realty sales in our findings total $31,400 and that this is a substantial part of the $54,000 in investments purchased with money, yet the fact that this much money was returned to the hoard strongly supports petitioners' story. All but three of the above transactions (which three totaled about $7,500) occurred prior to January 1, 1948, the opening date of the net worth statement. The conclusion that a large cash hoard did exist is inescapable. "The net worth-expenditures method of establishing net income * * * is effective only if the computations of net worth at the beginning and at the end of the questioned periods can reasonably be accepted as accurate." Bryan v. United States, 175 F. 2d 223, 225, affd. 338 U.S. 552. After carefully considering all of the facts *319 of record and considering that all of these facts had been disclosed to respondent (many by means of affidavits), or were readily discoverable by investigation, we have concluded that respondent's use of an opening cash item of $2,500 was so far from reasonable as to be capricious. Such a net worth reconstruction cannot be sustained. Fairchild v. United States, 240 F. 2d 944; Michael Potson, 22 T.C. 912, affd. 230 F. 2d 336 sub nom. Bodoglau v. Commissioner; United States v. Fenwick, 177 F. 2d 488; Holland v. United States, supra.
We are mindful of the fact that petitioner has pleaded guilty to the indictment for one of the years which now concern us. This plea is, of course, admissible here and is very often controlling on the question of fraud in a civil case. See e.g., Harry Gleis, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957); Nathan Goldsmith, 31 T.C. 56 (1958); Jesse Ullman Reaves, 31 T.C. 690 (1958), affd. 295 F. 2d 336 (C.A. 5, 1961). However, it is also competent for a taxpayer to explain away his prior plea and to point to any extenuating *320 circumstances under which the plea was offered. Helvering v. Mitchell, 303 U.S. 391; Thomas J. McLaughlin, 29 B.T.A. 247, 249; Eugene Vassallo, 23 T.C. 656, 660; Meyer J. Safra, 30 T.C. 1026, 1035. Here, we feel that the physical difficulties of the taxpayer (the existence of which respondent does not challenge), together with the clear understanding at the time of the plea that petitioner was not admitting civil liability, amount to such extenuating circumstances. We come now to the one event, alleged to have occurred on August 1, 1947, and to which respondent directed his entire energies on brief. As a facet of his cash hoard story, petitioner volunteered a narrative which described in much detail his taking $125,000 in cash to the local police station in Rome for safe-keeping on August 1, 1947, in preparation for a family trip to Indiana. Esther and petitioner's daughter, Faith, also testified in identical fashion. This story was flatly and unequivocally contradicted by two policemen called in rebuttal by respondent. It is obvious that if we accept the policemen's testimony unqualifiedly petitioners' credibility is shaken beyond *321 repair. While we believe that these policemen were honest, we also must note that the events as to which they testified (relating to the night of August 1, 1947) occurred 13 years prior to trial. Many local citizens habitually took money to the police station for safe-keeping and we therefore do not believe that petitioners' activities on that night were so unusual that they would have stood out vividly in the policemen's memories after 13 intervening years filled with many similar experiences. This is especially so since the policemen were in effect testifying as to a negative. The first of the two policemen (the one to whom petitioner stated that he gave the cash) testified that he was not on duty that night although he admitted, on cross-examination, that he occasionally went back to the station after his duty hours. He also testified as follows on cross-examination: Q. And you have got here, and you are relying on your testimony here, are you, on your diary that says vacation starts? A. Yes, sir. Q. August 1st? A. Yes, sir. Q. Now, let me ask you where you were August 1, 1947, if you remember this so vividly? A. I can't recall. I don't know. * * *
Q. But *322 you say, notwithstanding you don't know where you were, you do know you weren't at the police station; is that correct? A. That is correct. Q. And how do you know that answer, simply based upon the fact that your vacation started? A. Yes, sir. Q. Did you go out of town on your vacation, Captain? A. Yes, sir. * * *
Q. And to refresh your recollection, have you ever been called back to the police station because you were a notary public to take statements from people arrested when you were off duty? A. I have been, yes, sir. * * *
Q. Yes. And that was when you were not on duty at all, isn't that true? A. Yes. Q. And are you willing to say here that you weren't called back to the police station to take a statement or do anything this night of August 1st? A. I don't believe I was. I can't say. I am sure that I wasn't. Q. Will you swear that you weren't? A. I will, yes. Q. And what do you base that on, Captain, pardon me, I have demoted you, Chief. A. On the diary. I believe if there had been any special occasion it would have been noted in the diary. Q. Would you look through your diary for '47 and tell me any occasion when you were called back *323 to the police station after your tour of duty and you made a notation of it? (Witness examines diary.) A. No, I don't see any. * * *
Q. Now, you say the only reason that you know or feel that you weren't in the police station at nine o'clock on the evening of August 1, 1947, is because your diary stated your vacation started that day? A. That is right. Q. But notwithstanding that, you couldn't tell me if you were in the City of Rome, at Golden Beach or anywhere else August 1, 1947, can you? A. No, I cannot. The second policeman testified that he was then on duty, that he received no money from petitioner, and that the first policeman was not on duty that night. His memory of the details of the evening was poor and he also testified on cross-examination: Q. Your records don't refresh your recollection? A. It helps refresh, yes, sir. Q. That is the only thing you are basing your testimony on here, isn't it? A. At that length of time, yes, sir. * * *
Q. And whether [the first policeman] was there or not that night, you don't know either, do you? A. I do. Q. Of your personal knowledge I am talking about? A. Of my personal knowledge he was not there.
*324 Q. How do you know that, tell this Court. A. Because if [the first policeman] was there he would be called down, and that is the only time that I ever saw a Deputy Chief in the station when I was on duty that he was - when he was called down for some specific purpose. Q. And you are basing it on that factor? A. That is right. Q. You heard him testify his vacation started August 1? A. I knew that. Otherwise I wouldn't be in the police station in charge. Q. I say you heard him testify to that? A. Yes. Q. And you refreshed your recollection as to that on the way up here to court from your records, didn't you? A. Yes. Q. Of course. When you were first called on this, without going back to your records, you don't know anything about August 1, '47, did you? A. That is quite a while to remember. Q. That is correct. I am not finding fault with you, but that is a fact? A. Yes. Q. And your testimony here is being based upon your official records? A. That is right. The records from which he testified were not introduced into evidence. We are left with the definite impression that these two policemen were thus testifying from their records rather than from *325 independent memories and, further, that they were testifying largely on the basis of "what probably happened." Both witnesses were confused as to details; the first was somewhat inconsistent with an independent witness; and he also contradicted himself on the stand. We note again that the event in question could not prove the existence or extent of petitioners' cash hoard, for their testimony was that petitioner had the money in a large grocery sack which he handed to the policemen, saying only that it "contained valuables," and that the policemen placed it in the vault without looking inside. We believe that the event did occur. It is so bizarre as to be credible. Petitioner could have easily used a long dead or departed policeman if the story were fabricated. We accordingly hold, from the entire record, that respondent has failed to establish fraud by clear and convincing evidence. It follows that the statute of limitations is a bar to assessments for the years 1948 to 1953, inclusive. To give effect to the agreement of the parties as to 1954 and 1956, Decision will be entered under Rule 50. Footnotes
1. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1939.↩
*. Sec. 6653(b), I.R.C. of 1954↩. **. Petitioner paid $700 and assumed mortgage of $2,700. ↩
***. In these purchases petitioner first obtained a cashier's check in the amount due, such check being purchased with cash funds on hand. The cashier's check was used to pay the seller or mortgagor.↩
**. The cash or check received was converted into $100 bills and added to petitioner's cash hoard. ↩
***. Purchaser (Morgan) also gave $2,750 purchase money mortgage of which $1,950 was still due and owing on January 1, 1948, but was paid off in 1948.↩
*. The exceptionally large increase in this year is accounted for by petitioners' purchase in March of this year of 300 shares of American Telephone & Telegraph stock at a cost of over $51,000.↩
2. It is stipulated that this plea was made on the express understanding that petitioner was not admitting any civil tax liability for the years involved.↩
3. This is well demonstrated by the operation of the net worth principle in this case. For, its effect is to show income only when the increase appears in a form to the existence of which the preparer of the statement has given cognizance. Thus here it gives the impression that petitioners earned over $51,000 in less than 3 months of 1952, a period during which the record shows that petitioner spent most of his time caring for the needs of Esther who was quite ill and undergoing an operation.↩